Nicholas A. CHIARAMONTE, Plaintiff,

v.

**FASHION BED GROUP, INC., A DIVISION OF LEGGETT & PLATT, INC., Defendant.**

No. 95 C 1448.

United States District Court,
N.D. Illinois,
Eastern Division.

July 11, 1996.

Anthony Pinelli, Anthony Pinelli, Attorney At Law, Chicago, IL, for plaintiff.

Dennis P.W. Johnson, Diane C. Gerew, Carole A. Corns, Pugh, Jones & Johnson, P.C., Chicago, IL, for defendant.

### OPINION AND ORDER

NORGLE, District Judge:

Before the court is Defendant Fashion Bed Group, Inc.'s motion for summary judgment. For the following reasons, the motion is granted.

### I.

Plaintiff Nicholas A. Chiaramonte ("Chiaramonte") contends that FBG fired him because of his age.[1] Chiaramonte was born on November 29, 1932. He worked as a manager of engineering for a bed and home furnishing manufacturer, Dresher, Inc. ("Dresher"), from 1976 to 1985. In 1985, when Chiaramonte was fifty-two years old, he voluntarily left Dresher to work for its direct competitor, Berkshire Furniture Co., Inc. ("Berkshire"). John Elting ("Elting"), the President of Berkshire, and Dick Singer

---

1. The court derives the following facts from the parties' Statements of Material Facts filed pursuant to Local Rules 12(M) and 12(N). The court recognizes both parties' strict compliance with the oft-overlooked and oft-disobeyed rules.

("Singer"), the Chief Executive Officer of Berkshire, made the decision to hire Chiaramonte. Chiaramonte eventually became Berkshire's Vice President of Engineering.

Leggett and Platt, Inc. ("L & P"), FBG's parent company, acquired Berkshire in 1988. After the acquisition, Berkshire, as a wholly-owned subsidiary of L & P, acquired another bed manufacturer, J.B. Ross ("Ross"). L & P also acquired Dresher, Chiaramonte's former employer, in 1990. L & P operated Berkshire, Dresher and Ross as separate entities until 1991, when L & P merged the operations of all three entities into a single entity operating under the name Fashion Bed Group ("FBG"). The Berkshire management staff headed FBG; Elting and Singer remained as President and CEO, respectively, of FBG.

Following the mergers, FBG integrated the workforces of Berkshire, Dresher, and Ross. FBG President Elting personally selected which salaried employees from Dresher and Berkshire would be retained. In 1990, Elting terminated many employees, but appointed Chiaramonte as FBG's Vice President of Engineering and elected not to hire the Dresher employee who held the parallel position. Elting promoted Chiaramonte, who was then fifty-seven years of age.

Beginning in July 1990, Chiaramonte played a "key role" in the absorption of Dresher's equipment into Berkshire's manufacturing plants. Chiaramonte and Elting both began exploring new manufacturing methods for use in their plants. After research and investigation, Elting decided to implement one method at various FBG plants. As a result of the method change, Elting also changed the responsibilities of Chiaramonte and another coworker. Elting split the Vice President of Engineering position (once held by Chiaramonte) in half: Elting named Chiaramonte Vice President of Research and Development, thus relieving Chiaramonte of his responsibility for "mundane detail and day-to-day things," and assigned the rest of the position to Rob Cummins ("Cummins"), whom Chiaramonte originally hired at Berkshire, to the Director of Engineering position. Chiaramonte continued to report directly to Elting, while Cummins was to report to the Vice President of Operations, a position at the same organizational level to that of Chiaramonte's. However, at that time, the Vice President of Operations position was vacant and, as a result, Cummins reported directly to Elting.

Elting explains his decision to eliminate Chiaramonte's old position and create the two new jobs by stating that Chiaramonte would "flourish [at the new position] instead of getting bogged down in trying to figure out a lot of detail stuff." Instead, with the division of responsibilities, Chiaramonte could focus on the "work ... he did best; and that was on the continuing process of trying to get [FBG] into [the new method of manufacturing]."

FBG's financial records, including its general ledger, financial statements, balance sheets, and other accounting information, reveal that its sales and profits were much lower than originally expected. In 1991, FBG's sales were $8.5 million lower than anticipated. Moreover, FBG operated at a $6.6 million loss, $10.2 million less than the forecasted operating income of $3.6 million. These losses were attributed to problems in distribution, production planning, manufacturing operations, administrative support, and customer service. FBG received more orders than it could fill; as Elting put it, FBG was like a "runaway train." Chiaramonte offers nothing to dispute these facts.

Changes in the brass bed market further compounded FBG's internal problems. Customer preferences began to shift away from the high cost genuine brass beds manufactured by FBG towards lower cost plated brass or painted color beds. Additionally, foreign competitors began importing lower cost beds in direct competition with FBG. The problems resulted in several large customers either rescinding or reducing their orders. In an effort to guarantee that it could meet each order, and to prevent the steady erosion of customers, FBG utilized the "brute force" method: hire more employees to meet customers' orders and worry "what to do with all the employees later." The "later" was November 1991; the "what

to do with all the employees" was reduce the FBG workforce.

In November and December 1991, FBG set out to reduce its total workforce by a third. FBG decided to terminate 227 of its 679 employees. Of the 227 total layoffs, 190 were unionized hourly factory workers and the other thirty-seven were non-union employees. Of the thirty-seven non-union employees, eight were salaried workers whose ages ranged from sixty-six to twenty-six.

After the late 1991 reductions in force, Elting believed that FBG was "top-heavy" in management. Chiaramonte agrees; in late 1991, according to Chiaramonte, FBG was "dying" financially because FBG had "too many people, too much product, too much everything." FBG lost another $900,000 in the first two months of 1992. Faced with a top-heavy management structure and the company's serious financial trouble, once again, FBG needed to "downsize." Chiaramonte testified that this need was "very obvious" because FBG "had two people in every slot." Recognizing the obvious need for force reduction, Chiaramonte "thought his job was secure," however.

Unfortunately for Chiaramonte, he thought wrong. Elting made the decision to terminate additional employees, including twelve salaried professionals. Elting realized that eliminating salaried positions would result in losing skills and talents other employees did not have. However, those skills and talents were, according to Elting, "a luxury [FBG] could not afford ... [FBG] was in a do or die situation." In Elting's words, "[FBG was] out of time ... [FBG] had no luxuries to afford any extra costs."

In selecting the employees that he would terminate, Elting reviewed FBG's payroll register. The register listed every employee at FBG, in addition to each employee's salary and their previous rate increases. The register did not include the employees' dates of birth. Elting took the register home and, while sitting at his kitchen table, created a list of twelve employees that would eventually be terminated. Elting stated that he looked at three factors when determining which employee to terminate: the employee's salary, performance, and value to FBG. Age

was not a factor. At the time Elting assembled the list, Chiaramonte's salary was $73,000 per year, while Cummins' salary was $35,440 per year. Elting then submitted the list of twelve employees to FBG's corporate staff and L & P's legal staff. While Elting had authority to terminate employees without approval from L & P management officials, Elting discussed his evaluations with L & P's Senior Vice President before implementing his decisions. Thereafter, Elting terminated all twelve of the employees on this list. Those terminated ranged in ages from sixty-one to thirty-two. Chiaramonte was among the names on that list. As of March 13, 1992, Chiaramonte was terminated from employment at FBG. He was fifty-nine years old.

Elting alone made the decision to terminate Chiaramonte. Both Elting and Singer testified that Elting was the sole decision-maker with regard to the twelve management layoffs. Chiaramonte submitted no evidence to dispute their testimony. In addition, FBG produced memoranda regarding employee personnel changes. All such memoranda were authored and distributed by Elting. The CEO of FBG, Singer, had no involvement in that decision. In fact, Singer's daughter, Candace Singer, was also terminated by Elting on March 13, 1992. Elting testified by deposition that the first and third factors were at issue in Chiaramonte's termination. Neither Chiaramonte's performance nor his health history were factors. Chiaramonte carried a "huge salary" and had a "wealth of talent that [FBG] could get by without." (After Chiaramonte's termination, Elting wrote a letter of reference indicating that Chiaramonte's "strong work ethic and vast knowledge in combination with his creative abilities should make him a valuable addition to any organization.") Elting notified Chiaramonte of the termination in person and told Chiaramonte that "downsizing" was the reason for it.

After Chiaramonte's termination, Elting eliminated the Vice President of Research and Development position and divided the duties among several people. Among the people acquiring some of Chiaramonte's former duties was Cummins. Elting chose not

to terminate Cummins because Cummins (1) was detail-oriented, a quality necessary to FBG's engineering department, and (2) had a salary much lower than Chiaramonte.

## II.

Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *GCIU Employer Retirement Fund v. Chicago Tribune Co.*, 66 F.3d 862, 864 (7th Cir.1995). When considering a motion for summary judgment, the court may review the entire record, drawing all reasonable inferences from the record in the light most favorable to the non-moving party. *Cornfield by Lewis v. School Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir.1993). The burden of establishing the lack of any genuine issue of material fact rests with the movant. *Jakubiec v. Cities Serv. Co.*, 844 F.2d 470, 473 (7th Cir.1988).

The nonmovant, however, must make a showing sufficient to establish any essential element for which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The non-moving party cannot rest on the pleadings alone, but must identify specific facts which establish that there is a genuine triable issue. *Cornfield*, 991 F.2d at 1320. The non-movant must do more than simply "show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). It is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. *Covalt v. Carey Canada, Inc.*, 950 F.2d 481, 485 (7th Cir.1991); *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 476–77 (7th Cir.1988). Motions for summary judgment in employ-

ment discrimination cases "must be decided with particular care, given the extent to which the merits often turn on questions of credibility and intent." *Veprinsky v. Daniel, Inc.*, 87 F.3d 881, 893 (7th Cir.1996).

It is well-established that an employee may be terminated for "any reason, good or bad, or for no reason at all, as long as the employer's reason is not proscribed by a Congressional statute." *Kahn v. U.S. Sec. of Labor,* 64 F.3d 271, 279 (7th Cir.1995). The Age Discrimination in Employment Act ("ADEA") is an example of such a proscriptive statute. The ADEA [2] makes it unlawful for employers to engage in the following conduct:

> (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or (3) to reduce the wage rate of any employee in order to comply with this chapter.

29 U.S.C. § 623(a). The protections under ADEA extend only to those who have attained the age of forty or older. 29 U.S.C. § 631(a); *Collier v. The Budd Co.*, 66 F.3d 886, 889 n. 2 (7th Cir.1995).

In proving age discrimination, Chiaramonte may either present direct evidence of discrimination or follow the burden-shifting method set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). *See Sample v. Aldi Inc.*, 61 F.3d 544, 547 (7th Cir.1995). Chiaramonte has not provided direct "smoking gun" evidence of discrimina-

---

**2.** Congress enacted the ADEA primarily to "promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b). "The ADEA, enacted in 1967 as part of an ongoing congres-

sional effort to eradicate discrimination in the work place, reflects a societal condemnation of invidious bias in employment decisions. The ADEA is but part of a wider statutory scheme to protect employees in the work place nationwide." *McKennon v. Nashville Banner Publishing Co.,* —— U.S. ——, ——, 115 S.Ct. 879, 881, 130 L.Ed.2d 852 (1995).

tion; thus, he must rely on the burden-shifting method.

The United States Supreme Court recently altered the elements of a *prima facie* case with regard to the ADEA. *See O'Connor v. Consolidated Coin Caterers Corp.*, —— U.S. ——, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). The Supreme Court held that an ADEA plaintiff need not show that he or she was replaced by a person outside of the protected "over forty" class as part of a *prima facie* ADEA case. While the Court specifically limited its review to non-reduction-in-force cases, *O'Connor*, —— U.S. at —— n. 1, 116 S.Ct. at 1309 n. 1, this court finds *O'Connor* to have relevant bearing on reduction-in-force ("RIF") *prima facie* cases.

The Seventh Circuit's most recent RIF case listed the fourth of four elements of a RIF *prima facie* case as: "(iv) [proving] that others not in the protected class were treated more favorably. The employees who were more favorably treated must have been situated similarly to the plaintiff." *Smith v. Cook County*, 74 F.3d 829, 831 (7th Cir.1996) (citations omitted). Yet, in contrast, United States Supreme Court Justice Scalia wrote for the unanimous Court:

> As the very name "prima facie case" suggests, *there must be at least a logical connection between each element of the prima facie case and the illegal discrimination* for which it establishes a "legally mandatory, rebuttable presumption," *Burdine, supra,* at 254, n. 7, 101 S.Ct., at 1094, n. 7. The element of replacement by someone under 40 fails this requirement. The discrimination prohibited by the ADEA is discrimination "because of [an] individual's age," 29 U.S.C. § 623(a)(1), though the prohibition is "limited to individuals who are at least 40 years of age," § 631(a). *This language does not ban discrimination against employees because they are aged 40 or older; it bans discrimination against employees because of their age,* but limits the protected class to those who are 40 or older. *The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant,* so long as he has lost out because of his age. Or to put the point

more concretely, there can be no greater inference of age discrimination (as opposed to "40 or over" discrimination) when a 40 year-old is replaced by a 39 year-old than when a 56 year-old is replaced by a 40 year-old. Because it lacks probative value, the fact that an ADEA plaintiff was replaced by someone outside the protected class is not a proper element of the McDonnell Douglas prima facie case. Perhaps some courts have been induced to adopt the principle urged by respondent in order to avoid creating a prima facie case on the basis of very thin evidence—for example, the replacement of a 68 year-old by a 65 year-old. While the respondent's principle theoretically permits such thin evidence (consider the example above of a 40 year-old replaced by a 39 year-old), as a practical matter it will rarely do so, since the vast majority of age-discrimination claims come from older employees. In our view, however, *the proper solution to the problem lies not in making an utterly irrelevant factor an element of the prima facie case, but rather in recognizing that the prima facie case requires "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion...."* Teamsters v. United States, 431 U.S. 324, 358, 97 S.Ct. 1843, 866, 52 L.Ed.2d 396 (1977) (emphasis added). In the age-discrimination context, *such an inference can not be drawn from the replacement of one worker with another worker insignificantly younger.* Because the ADEA prohibits discrimination on the basis of age and not class membership, *the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class.*

*O'Connor*, —— U.S. at ——, 116 S.Ct. at 1310 (emphasis added). Respectfully, there can be no doubt that the Seventh Circuit's fourth *prima facie* element is now passé in age discrimination law. Indeed, the Seventh Circuit recently recognized,

> After *O'Connor*, statements in decisions such as *Sample v. Aldi, Inc.*, 61 F.3d 544, 548 (7th Cir.1995), and *Hill v. Burrell*

*Communications Group, Inc.,* 67 F.3d 665, 668 (7th Cir.1995), to the effect that the plaintiff must show that his replacement is of a different race (sex, etc.), cannot be considered authoritative. The question instead is whether the plaintiff has established a logical reason to believe that the decision rests on a legally forbidden ground. That one's replacement is of another race, sex, or age may help to raise an inference of discrimination, but it is neither a sufficient nor a necessary condition.

*Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 159 (7th Cir.1996).

Reading *O'Connor* and *Carson* together, the court finds that the fourth RIF *prima facie* prong in *Smith* is an insignificant factor and should be replaced. In its stead, the Supreme Court and Seventh Circuit require "evidence adequate to create an inference that an employment decision [—in an age discrimination RIF case, that the employer decided to retain another similarly-situated employee—] was based on a[n] [illegal] discriminatory criterion." *O'Connor,* —— U.S. at ——, 116 S.Ct. at 1310. In other words, in order to satisfy the fourth prong, a plaintiff should plead "a logical reason to believe that the decision [to terminate the plaintiff but retain another similarly-situated co-worker] rests on a legally forbidden ground." *Carson,* 82 F.3d at 159.

■ Thus, taking the age discrimination standard as altered by *O'Connor,* and merging the standard with the Seventh Circuit's *prima facie* case (modified for "reduction in force" cases), Chiaramonte must demonstrate that: (1) he was forty or older; (2) he was performing according to his employer's legitimate expectations; (3) he was terminated; and (4) evidence exists which creates an inference that his termination sprang from the "legally forbidden ground" of age discrimination. To satisfy the "sufficient evidence" fourth prong, Chiaramonte must show a "logical, but discriminatory, connection" between his age, the defendant's decision to terminate him, and the defendant's decision to retain a similarly-situated co-employee.[3]

■ Once Chiaramonte establishes a *prima facie* case, a rebuttable presumption is created: that FBG's decision not to promote Chiaramonte was based on the "consideration of impermissible factors." *See DeLuca v. Winer Indus.,* 53 F.3d 793, 797 (7th Cir. 1995). "The burden of production [—not proof—] then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action." *Sirvidas v. Commonwealth Edison Co.,* 60 F.3d 375, 377–78 (7th Cir. 1995). "If a legitimate explanation is provided, the presumption of discrimination dissolves, and the burden shifts back to the plaintiff to show that the employer's proffered reasons are a pretext for age discrimination." *Id.* at 378. "Pretext ... means a lie, specifically a phony reason for some action." *Russell v. Acme–Evans Co.,* 51 F.3d 64, 68 (7th Cir.1995). Thus, the ultimate burden of persuasion rests with, and never shifts from, the plaintiff at every point in the litigation process. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 508–11, 113 S.Ct. 2742, 2748–49, 125 L.Ed.2d 407 (1993).[4] Chiaramonte must prove that his position would not have been eliminated "but for" FBG's motive to discriminate against him

---

3. While no all-inclusive list of "inference-creating" evidence exists, the Supreme Court did mention one piece of evidence that would create such an inference: "the fact that a [retained similarly-situated employee] is substantially younger than the plaintiff." *O'Connor,* —— U.S. at ——, 116 S.Ct. at 1310. However, the Court specifically held irrelevant the fact that the chosen retainee was outside the protected class does not. *Id.*

4. As observed by Judge Posner in *Russell v. Acme–Evans Co. et al.,* 51 F.3d 64, 70 (7th Cir. 1995), the court recognizes that this asymmetrical burden places discrimination plaintiffs at a disadvantage. This disadvantage may be partic-

ularly poignant where, as here, the plaintiff faces a highly-funded opponent.

As in *Russell,* this court does *not* find that FBG did not discriminate against Chiaramonte; rather, it finds that Chiaramonte has failed to present sufficient evidence to defeat the motion. *See id.* Still, as noted in *Russell:*

> [T]here is nothing within our power ... that would lighten the burden of the employee without depriving the employer of procedural rights conferred upon him by settled law. And these procedural rights are not to be thought merely irksome obstacles to truth and justice. They are necessary to distinguish the real from the spurious cases of discrimination.

*Id.* at 71.

because of his age. *Karazanos v. Navistar Int'l Trans. Corp.*, 948 F.2d 332, 335 (7th Cir.1991) (quoting *La Montagne v. American Convenience Prods., Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984)); *see also Aungst v. Westinghouse Elec. Corp.*, 937 F.2d 1216, 1219 (7th Cir.1991).

### III.

#### A. *Prima Facie* Case

■ Turning to the merits of the case, the court addresses only those FBG and Chiaramonte arguments that directly relate to the *prima facie* case discussed previously in this Opinion and Order. FBG contends that Chiaramonte failed to establish the fourth prong of the *prima facie* case. (Chiaramonte clearly established the first three prongs: he was fifty-nine at termination; according to Elting, he performed at a more-than appropriate level throughout his employment; and he was terminated.) FBG argues first that Chiaramonte did not prove that substantially younger, but otherwise similarly-situated, co-workers were treated more favorably. Thus, taking FBG's argument and fitting it into the new *prima facie* framework, FBG essentially argues that Chiaramonte has not provided enough evidence to create an inference of age discrimination. Yet, Chiaramonte counters that Cummins was a similarly-situated employee who was reassigned to perform the responsibilities and duties previously-performed by Chiaramonte. In support, Chiaramonte offers two memoranda authored by Elting, one dated September 9, 1991, and the other dated March 13, 1992, the date of Chiaramonte's discharge. The court finds that the memos do show that, while it is undisputed that Cummins was over twenty years younger than Chiaramonte as of the date of Chiaramonte's termination, a genuine issue of material fact exists as to whether Cummins was an otherwise similarly-situated employee. Both Cummins and Chiaramonte were engineers employed as managers in the top echelon of the company. Cummins was only one step lower in the engineer "chain of command" and, like Chiaramonte, reported directly to Elting. Yet, FBG chose to terminate Chiaramonte's position and keep Cummins' position. This evidence, which includes evidence that FBG chose to retain an arguable similarly-situated co-worker "significantly" and "substantially younger than the plaintiff is ... a ... reliable indicator of age discrimination," *O'Connor,* — U.S. at —, 116 S.Ct. at 1310, and thus Chiaramonte has provided "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion." *Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). Accordingly, the court finds that Chiaramonte properly established a *prima facie* case of age discrimination.

#### B. FBG's Reasons For Terminating Chiaramonte

■ FBG articulated a legitimate, non-discriminatory reason for terminating Chiaramonte: FBG was forced to terminate first 227 persons and later twelve employees for business reasons, and Elting picked Chiaramonte as one of those twelve because of Chiaramonte's (1) "huge salary" and (2) "wealth of talent that [FBG] could get by without." FBG met its burden of production; the burden of proof now shifts to Chiaramonte to show that the reason was a subterfuge for age discrimination.

#### C. Pretext
##### 1. *Presumption of Nondiscrimination*

■ Prior to addressing whether Chiaramonte has met his burden of proof and will withstand the instant motion for summary judgment, the court notes that the instant facts give rise to an inference that discrimination was *not* a factor in terminating Chiaramonte. When the same person hires and fires a plaintiff, an inference of nondiscrimination is created. *EEOC v. Our Lady of the Resurrection Medical Ctr.,* 77 F.3d 145, 152 (7th Cir.1996). "The same hirer/firer inference has strong presumptive value." *Id.* The facts in the case *sub judice* establish that Elting hired Chiaramonte at fifty-two years of age. When Elting had to make the decision regarding who he wanted to "head up" FBG's engineering department, he chose Chiaramonte, even though Chiaramonte was fifty-seven.

Chiaramonte takes issue with FBG's statement that Elting decided to "keep" him as the top engineer at FBG. Since Elting did not interview any other Vice President of Engineering candidates, Chiaramonte argues, no such "decision" was made. Yet, this argument is flawed. Since Elting believed Chiaramonte to be qualified for the Vice President of Engineering position, interviewing additional applicants would be futile; Chiaramonte was the best person for the job at that time and Elting made an affirmative act of choosing to promote Chiaramonte to Vice President of Engineering at FBG.

This chronology makes suspect Chiaramonte's claim that the person that hired him at fifty-two, when he was well into the protected class, and elected to retain and appoint Chiaramonte to the highest engineering post when he was fifty-seven, "had suddenly developed an aversion to older people" less than two years later, when Elting terminated Chiaramonte's position. *Rand v. CF Indus., Inc.,* 42 F.3d 1139, 1147 (7th Cir.1994). Thus, a strong presumption and inference of nondiscrimination exists.

### 2. Rebutting the Presumption of Nondiscrimination

Chiaramonte's attempt at rebutting the inference of nondiscrimination consists of two distinct arguments. First, Chiaramonte argues that Elting was not the sole decision-maker, and that people other than Elting, who also took part in the decision, made statements from which a reasonable juror could infer that age played a part in Chiaramonte's termination. Second, Chiaramonte contends that FBG's reasons for terminating him directly conflict with additional evidence, giving rise to a genuine issue of material facts which, in turn, requires a trial.

#### a. The Decision–Maker

■ With regard to Chiaramonte's first argument, the facts show that Elting alone had the hapless task of determining who would be terminated. The three exhibits cited by Chiaramonte (the Elting deposition excerpts, statements by an accountant, Debbie Lunn, and Ernst & Young documents) do nothing to dispute this fact.

Chiaramonte argues that, because Elting forwarded the list of twelve soon-to-be-laid-off employees to FBG and L & P corporate and legal staffs, and discussed his determinations with L & P's Senior Vice President, Elting was not alone in making the decision to terminate Chiaramonte. However, Elting testified that he had the sole power to compile the list and make the terminations, but allowed the company "higher-ups" to review the list anyway. Elting slated twelve employees for termination, and Elting alone terminated all twelve of the employees. Neither the corporate and legal staffs nor the Senior Vice President commented on, criticized, or amended Elting's list.

Elting stated in his deposition that he was uncertain whether he discussed "any of the reductions in management" with Singer prior to the actual termination. Chiaramonte argues that the statement shows that Singer was involved in the decision-making. However, Elting's acknowledgement of uncertainty is not contrary to his testimony that he alone made the termination decisions. Although Elting and Singer may have discussed "reductions in management" prior to Chiaramonte's termination, there is no evidence that the two discussed the reasons for terminating Chiaramonte (or any of the eleven other terminated management-level employees, including Singer's daughter). Moreover, Elting's "uncertainty" is clarified by Singer's unequivocal testimony that no such conversation ever took place. Both Elting and Singer testified that Elting had the sole authority to terminate employees and was the sole decision-maker in all twelve of the "second wave" management position terminations, which included Chiaramonte's layoff. Nothing Chiaramonte has submitted refutes this testimony. Thus, the court finds no factual dispute as to whether Elting alone made the decision to terminate Chiaramonte.

■ As such, any post-termination comments Singer may have made for Chiaramonte's termination are irrelevant. Singer's alleged statement, "Well, there's age," is not the well-grounded "smoking gun" admission perceived by Chiaramonte. Singer denies making the statement, and Chiaramonte is

unable to corroborate his own allegation. Indeed, when cross-examined, Chiaramonte expressed uncertainty as to whether Singer made that actual statement. Instead, Chiaramonte stated under oath that Singer told him "age had to be a factor . . . but I don't know." The context of the statement shows that Singer was merely speculating as to why Elting made the decision to fire Chiaramonte. Yet, even assuming that Singer made such a statement, the statement cannot be considered an admission by FBG. Post-termination statements made by non-decision-makers have no bearing on the instant age discrimination query—whether the decision-maker, Elting, chose to terminate Chiaramonte because of his age. *See Tennes v. Massachusetts Dep't of Revenue*, 944 F.2d 372, 378 (7th Cir.1991). Post-termination statements made by non-decision-makers are not probative of the employer's pre-termination mental state, do not affect the decision to terminate, and are immaterial in age discrimination cases. *Id.*

██ Even if Singer were a decision-maker, that arguable confession of a legal wrong does not necessarily create legal liability. *Dranchak v. Akzo Nobel Inc.*, 88 F.3d 457, 461 (7th Cir.1996). "The ADEA forbids an employer to make age the basis for adverse action, but it creates a remedy only if the forbidden consideration altered the employer's decision." *Id.* "[I]f the employer knows of a legitimate and independently sufficient reason for discharge [in addition to the plaintiff's age], and relies on this reason at the time of the discharge, then age did not lead to any adverse action." *Id.*

Chiaramonte also points to evidence that a consulting firm, Ernst & Young, was "actively advising" FBG to change Chiaramonte's function to "exist outside the formal engineering structure and . . . report directly to the General Manager." According to Chiaramonte, this advice shows that Elting was not the sole decision-maker on hiring and firing. However, Chiaramonte's own words refute his contention. According to Chiaramonte, Ernst & Young "advised" Elting and his superiors; such advice, by definition, has no binding effect. Additionally, the record reveals that Elting later refused to take the advice of Ernst & Young and, in March 1992, terminated Chiaramonte's position instead of retaining Chiaramonte but limiting his functions to exist outside FBG's formal engineering structure.

Further, a statement made by Debbie Lunn, a "cost accountant," that "we are going to get rid of all you old people" is of no relevance here. Lunn denies making the statement. Yet, notwithstanding the denial, and assuming the statement was actually made, that statement is not proof of discrimination by FBG's decision-maker. Lunn played no role in Elting's decision to eliminate Chiaramonte's position, nor did she ever discuss with Elting Chiaramonte's termination before it occurred. Lunn attended no company meetings at which layoffs of the twelve managers were discussed, and was neither asked for nor provided with any information, evaluation, recommendation or other comment about Chiaramonte or his value to FBG. Lunn was unaware of Elting's decision to terminate Chiaramonte until the layoff was announced. Simply put, Lunn took no part in Chiaramonte's demise.

*b.  Conflicting Evidence*

██ Chiaramonte next contends that statements made by Elting at an Illinois Department of Human Rights fact-finding conference, certain financial reports of FBG, and a release form FBG required Chiaramonte to sign after his termination all provide evidence from which a reasonable juror could infer that FBG "lied" about its reasons for terminating Chiaramonte. As the Seventh Circuit stated in *Shager v. Upjohn*, 913 F.2d 398 (7th Cir.1990):

> [T]he question . . . is only whether . . . [the plaintiff] produced evidence from which a rational factfinder could infer that the company lied. . . . If the only reason an employer offers for firing an employee is a lie, the inference that the real reason was a forbidden one, such as age, may rationally be drawn. This is the common sense behind McDonnell Douglas. . . . The point is only that if the inference of improper motive can be drawn, there must be a trial. Id. (emphasis in original).

*Id.* at 401. However, the court finds that Chiaramonte has *not produced evidence from which a rational factfinder could infer that* FBG lied.

Chiaramonte argues that certain statements Elting made while at a fact-finding conference at the Illinois Department of Human Rights conflict with the "huge salary" and "wealth of talent" reasons given at Elting's deposition and are evidence that age played a factor in his termination. Elting told an investigator that Chiaramonte was fired because Chiaramonte would be unable to "crawl through the dirt while rebuilding the company," "cultural differences in the organization," and because Chiaramonte didn't possess "team synergy." Chiaramonte argues that these three statements "are comments on [his] age" and have nothing to do with the reduction-in-force-related reasons. The court disagrees.

First, the reasons are not in conflict with those given by Elting in his deposition. The record makes clear the basis for Chiaramonte's termination: FBG was in dire financial straits; Elting had to fire Chiaramonte because his salary was too great and FBG was unwilling and unable to pay Chiaramonte the amount his "wealth of talent" required. The three statements given by Elting at the Illinois Human Rights Department Office were variables within the decision-making process. Given Elting's view that Chiaramonte would not be able to work together with other workers, would not perform the detailed, more menial tasks, and that Chiaramonte had cultural differences were factors in determining that Chiaramonte's salary was not commensurate with his economic value to FBG. Chiaramonte was "overqualified" for FBG's engineering staff. Thus, Elting chose to terminate Chiaramonte's position and retain lower-level employees with similar, but less-established, qualifications who were more likely to "mesh" with other employees.

Second, even assuming that the statements at the fact-finding hearing conflict with the salary/talent explanations given by Elting, the three statements are not probative of age discrimination; they are legitimate, non-discriminatory reasons for Chiara-

monte's termination. Synergy is defined as "working together; the action of two or more substances, organs, or organisms to achieve an effect of which each is individually incapable; the theological doctrine that regeneration is effected by a combination of human will and divine grace." Webster's II New Riverside University Dictionary 1174 (1988). Moreover, it is not unlawful to terminate *the positions of those who are unwilling to "crawl through the dirt"—or "do the dirty work"*—necessary to rebuild a faltering company. Further, while firing an individual because of a "cultural difference" could, in some cases, be evidence of race or national origin discrimination in violation of Title VII of the Civil Rights Act of 1964 (as amended in 1991), Chiaramonte alleges only age discrimination in violation of the Age Discrimination in Employment Act.

Chiaramonte also argues that there is a genuine issue of material fact as to whether FBG actually incurred "operating" or "actual" losses, beyond its expected losses. This "ambiguity," according to Chiaramonte, should be resolved by a jury. In support of his argument, Chiaramonte points to a conflict between two alleged affidavits. However, the first affidavit was unsigned—and "hence unsworn"—unfiled, and legally invalid. *Sellers v. Henman,* 41 F.3d 1100, 1101 (7th Cir.1994). Therefore, the affidavit is inadmissible. *Id.* However, the second affidavit, which was signed and filed with the court, is valid. Nonetheless, FBG explains to the court that the terms "operating losses" and "actual losses" are synonymous. The alleged "ambiguity" is of no consequence; Chiaramonte has not produced evidence to dispute that FBG expected to earn $3.6 million, but lost $6.6 million. This loss, whether it be an "operating" or "actual" loss, prompted a massive reduction in force in which FBG eliminated a total of 239 positions in order to "stay afloat." Chiaramonte's argument that FBG lied about its losses and fired a third of its employees for reasons other than financial ones is unreasonable and would not cause a reasonable juror to find that the reduction-in-force was a subterfuge for discriminating

against Chiaramonte because of his age.[5]

Finally, Chiaramonte argues that the release form signed by Chiaramonte was not only invalid and unenforceable, 29 U.S.C. § 626(f)(1) and *Oberg v. Allied Van Lines*, 11 F.3d 679, 682 (7th Cir.1993), but is direct evidence of willful discrimination. The court agrees that the release form was in violation of the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f)(1), in numerous ways.[6] Thus, Chiaramonte did not waive his right to file suit in federal court. However, the court is unaware of any precedent holding an improper release to be direct evidence of discrimination. The release was prepared and signed after Elting made the decision to terminate Chiaramonte. Thus, the release has no evidentiary value.

The record is clear: FBG terminated Chiaramonte's position because, at the time of termination, it made a business decision that it could not afford Chiaramonte or the other 239 employees fired between November 1991 and March 1992. In other words, FBG terminated Chiaramonte and 239 coworkers for salary and other economic reasons. Salary considerations are legitimate, non-discriminatory reasons for terminating employees.

The ADEA was enacted by Congress because of its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes. However, when the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears.... This rationale applies with equal force to cases where workers are discharged because of salary considerations. Compensation is typically correlated with age, just as pension benefits are. The correlation, however, is not perfect. A younger worker who has spent his entire career with the same employer may earn a higher salary than an older worker who has recently been hired by the same employer. Because age and ... [compensation levels] are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on ... compensation level is necessarily "age-based."

*Anderson v. Baxter Healthcare*, 13 F.3d 1120, 1125 (7th Cir.1994). The court finds that FBG legally terminated Chiaramonte in compliance with the ADEA. Chiaramonte

5. Chiaramonte also questions the amount saved by terminating him. Chiaramonte argues that pay increases given to Cummins in addition to salaries of two workers hired in February 1993 caused FBG to pay $114,000 for the same duties performed by Chiaramonte for $75,000. Yet, Chiaramonte improperly focuses this argument on events occurring after his layoff. FBG's profitability began to improve near the end of 1992, resulting in the need for additional hires and allowing FBG to reward those employees whose salaries were "frozen" during the company's financial woes. If the court were to accept Chiaramonte's argument, it would in effect have to hold that an inference of discrimination forms when a company that, at one time, was forced to "downsize" for financial reasons, subsequently hires additional employees and gives salary raises to employees it chose not to terminate. The court declines to accept Chiaramonte's reasoning and argument.

6. According to Older Workers Benefit Protection Act,

An individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary. Except as provided in paragraph (2), a waiver may not be considered knowing and voluntary unless at a minimum—

(A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;
(B) the waiver specifically refers to rights or claims arising under this chapter;
(C) the individual does not waive rights or claims that may arise after the date the waiver is executed;
(D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;
(E) the individual is advised in writing to consult with an attorney prior to executing the agreement;
(F)(i) the individual is given a period of at least 21 days within which to consider the agreement; or
(ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement.

29 U.S.C. § 626(f)(1).

has not submitted evidence establishing a genuine issue of material fact. Without such evidence, the presumption of nondiscrimination remains. Accordingly, the court grants FBG's motion for summary judgment.

## IV.

Chiaramonte has not met his burden of proving that FBG's articulated reasons were a pretext for age discrimination. Since Chiaramonte has not provided the court with sufficient evidence from which a reasonable juror could infer that FBG's articulated reasons were a "cover" for age animus, summary judgment in favor of FBG must be granted.

IT IS SO ORDERED.