**John T. RUSSELL, Plaintiff–Appellant,**

**v.**

**ACME–EVANS COMPANY, ADM Milling Company, and Archer–Daniels–Midland Company, Defendants–Appellees.**

**No. 94–3008.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 12, 1995.

Decided March 20, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied April 19, 1995.

---

5. For example, Whitlock claims that John Fleming would have testified that he never saw Steidl and Reinbolt together at a local tavern called the Tap Room, which would have contradicted portions of Reinbolt's testimony.

Richard L. Darst (argued), Mantel, Cohen, Garelick, Reiswerg & Fishman, Indianapolis, IN, for plaintiff-appellant.

·Kenneth J. Yerkes (argued), Barnes & Thornburg, Indianapolis, IN, for defendants-appellees.

Before POSNER, Chief Judge, ROVNER, Circuit Judge, and MORAN, District Judge.*

POSNER, Chief Judge.

In 1975 the plaintiff in this Title. VII suit, John Russell, was hired as a laborer by the principal defendant, Acme–Evans Company, which owns a grain elevator in Indianapolis. The elevator is used both to store wheat and to manufacture it into flour. Russell (who still works in the grain elevator) became a "mill sweeper" in 1977. The job involved keeping the floor of the elevator clean. He liked the job. It gave him the run of the plant, and is considered light work. The mill sweeper does not just use a broom; he uses a machine—we suppose some grand elaboration of a vacuum cleaner—to do the sweeping.

In 1990, when Russell had worked longer at the plant than almost anyone else, new supervisors, who were white (as had been the old ones), began giving Russell warnings for failing to wash his hands and for other infractions of work rules. Two years later Russell, who was now· 59 years old, was

---

* Hon. James B. Moran, Chief Judge of the Northern District of Illinois.

transferred from his job as mill sweeper to the job of "skid wrapper." A more strenuous and monotonous job, it required Russell to wrap heavy plastic sheets around loads ("skids") of bags of flour. He claims that he was transferred to make room for a young white man who wanted to be "downgraded" from assistant miller to mill sweeper. Although assistant miller is a more responsible and even lighter job—the assistant miller helps the miller operate the large machine that grinds wheat into flour, and the machine is operated by pushing buttons—and pays more ($9 an hour versus $8 for a sweeper), apparently it's not uncommon for workers to want to downgrade to the sweeper's job, perhaps because it is less stressful, or perhaps because workers enjoy having the run of the mill.

Shortly after Russell was transferred to the skid-wrapper job, he applied to become an assistant miller but was turned down in favor of a young white man. The following year Russell sought to work overtime as a member of the "blow-down" crew. This is a four-person crew that cleans the seven-story grain elevator. One of the men in the crew is lowered in a chair by one of the other men, and he uses an air hose (fed to him by the third member of the crew) to clean bugs and other debris from the walls of the elevator, while the fourth member of the crew shines a light on the work area. The members of the crew rotate through the four positions. The company would not permit Russell to join the blow-down crew, instead giving this opportunity for overtime work to younger white men. Russell claims that the denial of this opportunity, together with the transfer to skid wrapper and the refusal to promote him to assistant miller, was motivated by his race and age. The district court granted summary judgment for the company.

The company had submitted affidavits that offered nondiscriminatory reasons for the three employment actions of which Russell complains. According to these affidavits, Russell had been transferred to the skid wrapper's job because (among other reasons), in light of his disciplinary infractions, he required closer supervision than was feasible for a sweeper, who as we said circulates

through the entire plant. He had been turned down for the assistant miller's job because he was not trained for it and the white man who was given the job "demonstrated a mechanical aptitude" and "worked well with others"; and a black man had been offered the job before the white man, but had turned it down. Russell had been turned down for the blow-down crew because he already was getting more overtime than most of the workers (although the collective bargaining agreement did not require that opportunities for overtime be allocated by seniority), and because at 190 pounds he was too heavy for the chair position.

To survive a motion for summary judgment, Russell had to counter the company's affidavits with materials of evidentiary quality (such as affidavits or depositions, see *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267–68 (7th Cir.1994)) that created an issue of fact as to whether the reasons offered by the company were sincere—in Title VII lingo, not "pretextual"—or other, discriminatory reasons had played a role in motivating the actions. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981); *Colosi v. Electri–Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992). All that Russell offered to meet this burden were his deposition and a subsequent affidavit designed, it appears, to retract or explain away concessions that he had made in his deposition. We have been highly critical of efforts to patch up a party's deposition with his own subsequent affidavit. E.g., *Pries v. Honda Motor Co.*, 31 F.3d 543, 545 (7th Cir.1994); *Lovejoy Electronics, Inc. v. O'Berto*, 873 F.2d 1001, 1005 (7th Cir.1989); *Adelman–Tremblay v. Jewel Cos.*, 859 F.2d 517, 520–21 (7th Cir.1988); *Diliberti v. United States*, 817 F.2d 1259, 1263 (7th Cir.1987); see also *Wilson v. Westinghouse Electric Corp.*, 838 F.2d 286, 289 (8th Cir.1988). Almost all affidavits submitted in litigation are drafted by the lawyers rather than by the affiants, *DF Activities Corp. v. Brown*, 851 F.2d 920, 923 (7th Cir.1988); *Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 659 (7th Cir.1991) (en banc), and a comparison of the diction of Russell's deposition with that of the affidavit makes clear that his affidavit is no exception. Where deposition

and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy. *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1297 (7th Cir.1993); *Adelman–Tremblay v. Jewel Cos., supra,* 859 F.2d at 520–21; *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 861–62 (7th Cir.1985).

■ Disregarding, then, those parts of Russell's affidavit that contradict, as distinct from merely clarifying or augmenting, his deposition, we have a case, common under Title VII, in which the only evidence submitted in opposition to the employer's motion for summary judgment is the plaintiff's own testimony. Evidence required to contradict the employer's evidence is rarely within the competence of the plaintiff to give, because of the rule that a witness (other than an expert witness) is not allowed to testify to matters outside his personal knowledge, Fed.R.Evid. 602, 701(a); Note of the Advisory Committee on 1972 Proposed Rule 701; *Visser v. Packer Engineering Associates, Inc., supra,* 924 F.2d at 659; *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir.1989), as well as because of other limitations on the admissibility of evidence, such as the hearsay rule. See, e.g., *Friedel v. City of Madison,* 832 F.2d 965, 970 (7th Cir.1987). For example, Russell's effort to establish the presence of a racial motive (he made no effort to establish that his age had been a motive) for the actions that he claims were discriminatory depended heavily on hearsay evidence concerning racial slurs allegedly made by white supervisors to other black workers. This evidence is not claimed to fall within any of the myriad exceptions to the hearsay rule, and hence could not be considered in the summary judgment proceeding. Russell's first-hand experience of having been threatened fifteen years earlier by a coworker with having a shotgun shoved up his "black ass" was too tenuously related to the alleged discriminatory actions by supervisors many years later who had not even been employed at the plant during the earlier incident to create, or even to contribute to creating, a genuine issue of fact concerning the existence of a racial motive for those actions. *Shager v. Upjohn Co.,* 913 F.2d 398, 402 (7th Cir. 1990); *McCarthy v. Kemper Life Ins. Cos.,* 924 F.2d 683, 686–87 (7th Cir.1991); *Merrick v. Farmers Ins. Group,* 892 F.2d 1434, 1438–39 (9th Cir.1990).

■ The focus of the deposition (and affidavit) in any event was to show not that a racial motive had been operative but that a jury (trial by jury is now available in Title VII suits, and was demanded by Russell) might conclude that the reasons offered by the company for the employment actions of which he complains were pretexts. If "pretext" meant simply mistake, a plaintiff's testimony could go far to create a genuine issue of material fact in these cases. But neither in ordinary language nor in the law does it mean a mistake. It means a lie, specifically a phony reason for some action. To say that it was only a "pretext" that Russell was transferred to the wrapper's job because he needed closer supervision is to say that the company is lying when it proffers that reason for the transfer; the true reason was different. *Visser v. Packer Engineering Associates, Inc., supra,* 924 F.2d at 657; *Pollard v. Rea Magnet Wire Co.,* 824 F.2d 557, 559 (7th Cir.1987).

It is unusual for an employee to be able to testify *from his personal knowledge* to whether the employer was being honest about why it took some adverse action against him. Not in every case, of course; if the company had claimed to have transferred Russell because he confessed to stealing company property, his denial of having confessed would create a genuine issue of material fact, at least in the absence of other, irrefutable evidence in support of the company's claim. As to some of the reasons offered by the company the district judge correctly found that Russell's testimony *had* created a genuine issue of material fact. One reason the company offered for transferring Russell to the wrapper's job was "Russell's habit of wandering from work area," or as it said in its brief, "Russell's propensity to wander about the mill unchecked." Russell testified, however, that it was his job as sweeper

to go wherever in the plant he was summoned by a bell. This was testimony about something within his personal knowledge. Nor would it have been plausible that the company honestly but mistakenly believed that his job required him to stay in one place.

■ It is possible that the parties were testifying at cross-purposes: that Russell was merely pointing out, what no one could deny, that the sweeper's job takes him all over the plant; and that the company, aware of this, was asserting that he moved about more than was necessary, or went to the wrong places—that, in short, he was soldiering on the job. If this is what the company meant, Russell's testimony was not responsive. But on summary judgment, interpretive ambiguities must be resolved in favor of the nonmoving party, and so in favor of Russell, which is what the district judge did.

Now it might seem that as soon as one reason for an allegedly discriminatory action is found to be a pretext (or rather must be *assumed* for purposes of summary judgment to be a pretext, because the plaintiff has succeeded in putting the matter in doubt), the company's honesty is so far drawn in question, and the plausibility of supposing that the action was not based on an invidious motive is so weakened, that the defendant cannot possibly stave off a trial. But this is true only if the company has offered no other reason that, *if that reason stood alone* (more precisely if it did not have support from the tainted reason), would have caused the company to take the action of which the plaintiff is complaining. *Kralman v. Illinois Dept. of Veterans' Affairs*, 23 F.3d 150, 157 (7th Cir. 1994). Suppose the company claims to have had two reasons either of which would have caused it to take the action. Concretely, suppose that in a case of alleged racial discrimination in which the plaintiff was fired, one reason given by the employer is that the plaintiff is a thief and the other is that he is a drug dealer. Suppose the plaintiff succeeds in showing that the company may not *really* have believed he is a thief, or that it would not have fired him even if it had believed this, but it is conceded both that the company believed that he is a drug dealer and that this belief would have caused the company to

fire him even if the company did not actually believe that he was a thief as well but tossed this additional "reason" into the pot merely to make its case for firing him more impressive. It would be plain that the plaintiff would have been fired regardless of his race, and so he could not withstand summary judgment. *Carr v. Allison Gas Turbine Div., General Motors Corp.*, 32 F.3d 1007, 1012 (7th Cir.1994); *Pignato v. American Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir.1994).

■ The defendant has offered several independent reasons, backed up by affidavits, for each of the challenged actions. The fact that some of these reasons were successfully called into question by Russell's deposition or affidavit does not defeat summary judgment if at least one reason for each of the actions stands unquestioned. In the case of the transfer, the surviving reason is that the company was dissatisfied with his performance, the dissatisfaction being manifested by a number of disciplinary warnings, and wanted to transfer him to a job that, because it was more routinized and performed in one place, would enable his performance to be monitored more effectively. Against this all that Russell could offer was his opinion that his performance as a sweeper was adequate. But the issue was not the adequacy in fact of his performance. It was the honesty of the company's belief that it was inadequate, and as to this Russell had no basis for testifying. *Visser v. Packer Engineering Associates, Inc., supra*, 924 F.2d at 659; *Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1146–47 (7th Cir.1994); *Dey v. Colt Construction & Development Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994). Russell could have tried to show that white workers (or young workers) whose performance was no better than his were not transferred to less desirable jobs. In fact he asserted this, but he did not show that he had personal knowledge of the performance of these other workers, none of whom he attempted to depose; nor did he depose the supervisors who he alleged discriminated against him.

■ Concerning his failure to win promotion to assistant miller, he made no effort to refute the evidence that the young white man who got the job had demonstrated a

mechanical aptitude and got along well with other workers, strengths that Russell does not claim to have. He ridicules the "mechanical aptitude" evidence as a mere conclusion, unworthy of belief, pointing out that no effort was made to substantiate the claim or to explain its relation to the assistant miller's job. The milling machine is a complicated piece of equipment vital to the operation of the mill, and presumably one wants it operated by people with mechanical aptitude. But there is no evidence of this, and no proof that the fellow who got the job had demonstrated his mechanical aptitude. We cannot say, however, that the attestation that the person appointed to the assistant miller's job had demonstrated a mechanical aptitude was so vague or conclusional as not even to be admissible, or admissible but unworthy of belief even in the absence of any contrary evidence—for there was none, except that Russell had received some training on the machine and had occasionally substituted for previous assistant millers, though apparently only for short periods of time. That was hardly evidence of a demonstrated mechanical aptitude, for there was no evidence that he performed the job well. Testimony that someone has "demonstrated a mechanical aptitude" for something is an invitation to probe deeper, but in the absence of such probing it cannot be dismissed. It was within the scope of observation and evaluation of the supervisor who gave the affidavit in question to identify workers who showed a mechanical aptitude, Fed.R.Evid. 602, 701, and it was up to Russell to present contrary evidence, or to tear the affidavit apart by deposing the affiant and finding out exactly what he meant and what he based his judgment on.

■ With respect, finally, to the matter of the blow-down crew, Russell's deposition acknowledges that because of his weight the other members of the crew didn't want him in the chair; and when this evidence is combined with uncontradicted evidence that the crew likes to rotate among the four positions (we suppose because the one who lowers the chair has by far the most strenuous job), it dooms Russell's case. In his affidavit he claimed, directly contrary to his deposition testimony, to have been one of the *lighter* men in the crew. He would have done better to depose other members of the crew than to repudiate his own deposition.

■ There may be cases in which the multiple grounds offered by the defendant for the adverse action of which the plaintiff complains are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment. This is not such a case. We must remember that a canonical formulation of the test for whether to grant summary judgment is whether, if the record at trial were identical to the record compiled in the summary judgment proceedings, the movant would be entitled to a directed verdict because no reasonable jury would bring in a verdict for the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Palucki v. Sears, Roebuck & Co., supra.* In the face of Acme–Evans' uncontested grounds for transferring Russell, and with no evidence that Acme–Evans' true motivation was racial, no reasonable jury could infer from doubt over whether Russell's "wandering" played a real rather than pretextual role in the transfer that the true motivation for the transfer was indeed his race.

The practical inability of a plaintiff in a Title VII case to get past summary judgment unless he presents evidence other than what comes out of his own mouth could be thought troubling. Even with the recent amendments to Title VII, the expected judgment in an employment discrimination case, especially one brought by an hourly-wage worker, will rarely be large enough to repay a substantial investment in the development of evidence at the summary judgment stage, which is to say before the case even gets to trial. And on the other hand employers have incentives to invest heavily in the defense of these cases, in order to deter the bringing of them. See Marc Galanter, "Why the 'Haves' Come Out Ahead: Speculation on the Limits of Legal Change," 9 *Law and Society Review* 95 (1974). The asymmetry puts the plaintiff at a disadvantage, as this case illustrates. There is no basis for confidence that the defendant did *not* discriminate against Rus-

sell on account of his race and age; it is simply that Russell has not presented enough evidence, perhaps because he could not afford to present more, to withstand the company's motion. But there is nothing within our power to do that would lighten the burden of the employee without depriving the employer of procedural rights conferred upon him by settled law. And these procedural rights are not to be thought merely irksome obstacles to truth and justice. They are necessary to distinguish the real from the spurious cases of discrimination.

AFFIRMED.