Michael J. FERNBACH, Plaintiff,

v.

DOMINICK'S FINER FOODS,
a Delaware Corporation,
Defendant.

No. 95 C 5252.

United States District Court,
N.D. Illinois,
Eastern Division.

July 26, 1996.

---

Donald S. Rothschild, Mark C. Gross (argued), Goldstine, Skrodzki, Russian, Nemec & Hoff, Ltd., Summit, IL, for plaintiff Michael J. Fernbach.

Mark Andrew Lies, II, Janet C. Hershman (argued), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for defendant Dominick's Finer Foods, a Delaware corporation.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge:

Plaintiff Michael Fernbach brings this employment discrimination action against Dominick's Finer Foods, claiming that the defendant discriminated against him on the basis of his mental disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* Presently before the court is the defendant's motion for summary judgment. For the reasons set forth below, the motion is granted.

### I. Background

At age seventeen, Fernbach began his Dominick's career in April 1980, first working as a check-out bagger, then as a cashier, and later as a stock clerk. Unfortunately, in September 1984, the plaintiff required emergency brain surgery for a cerebral aneurysm. During the surgery, Fernbach suffered a stroke that caused "substantial neurological impairments, including ... a seizure disorder, cognitive impairment[,] and a speech impediment." Pl.'s 12(N)(3)(b) ¶ 1.[1] Accord-

---

1. Under General Rule 12(M) of the United States District Court for the Northern District of Illinois, a party moving for summary judgment must submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." The nonmovant must then specifically respond to each of the movant's factual assertions, and include, "in the case of any disagreement, specific references to

ing to the plaintiff, the mental impairments render mental tasks difficult, including reading comprehension, performing mathematical functions, and remembering and following instructions. *Id.* ¶ 2.

After the surgery, Fernbach returned to Dominick's part-time in March 1985, performing inventory duties in the dairy section. However, he had some difficulty fulfilling his duties, *see* Def.'s 12(M) ¶¶ 33–34; Pl.'s 12(N) ¶¶ 33–34, and eventually asked to return to the night stock clerk position. After this request was granted, Fernbach was transferred to another store in July 1986. A supervisor and eventual store manager, Eddie Santiago, thought the plaintiff was "hardworking and dedicated," but Santiago had to occasionally reassign tasks from Fernbach to other employees in exchange for other "less complicated" tasks. Santiago Aff. ¶¶ 3–4. For example, when the plaintiff encountered trouble using an ordering gun, Santiago told Fernbach that "he no longer had to use the ordering gun." Def's 12(M) ¶ 41. According to Santiago,

> On several occasions, it was necessary that I repeat or explain in detail instructions to MICHAEL FERNBACH so that he could fully understand tasks that were being assigned to him.

Santiago Aff. ¶ 5.

Fernbach continued to work at Dominick's until 1995. In early January 1995,[2] the plaintiff wanted to buy some Dominick's store merchandise, specifically, Fred Flintstone picture frames, a Christmas ornament, and a Burl Ives compact disc. *See* Pl.'s 12(N)(3)(b) ¶ 8; Def.'s 12(M) ¶ 64. However, he was not carrying enough money with him, and thus stored the items in his employee locker, in-

tending to purchase the items when he returned from the vacation on which he was about to depart. Pl.'s 12(N)(3)(b) ¶ 8. On January 9 or 10, 1995, the plaintiff returned to work. Prior to the start of his shift, Fernbach took *Wolverine* comic books from the magazine rack and placed them in his locker. Def.'s 12(M) ¶ 62. According to Fernbach, and uncontested by the defendant, the plaintiff "had sufficient money with him to purchase the items, which he intended to do at the end of his shift." Pl.'s 12(N)(3)(b) ¶ 9; Def.'s Reply to 12(N) ¶ 9.

However, after Dominick's "Loss Prevention Officer" Bradley Kister spotted Fernbach placing the comics in the locker, Pl.'s 12(M) Appdx., Ex. C at F56, Kister and store security chief Dan Dietterle[3] found the merchandise in the locker after Fernbach willingly opened it. *See* Def.'s 12(M) ¶ 63; Pl.'s 12(N)(3)(b) ¶ 10. According to reports prepared by Kister and Dietterle, Fernbach stated that he intended to pay for the merchandise after the shift. Pl.'s 12(N)(3)(b) ¶ 10, Appdx., Ex. C at F55–56. Fernbach was escorted to the security office where, according to the plaintiff, he was "pressured" to sign a preprinted "Employee Statement" form that he did not understand; the form stated that Fernbach admitted to taking merchandise "without paying for said merchandise and intending to permanently deprive said company of such merchandise." Pl.'s 12(N)(3) ¶ 12. According to Kister's report, the plaintiff "was sent home," Pl.'s 12(N)(3)(b), Appdx. Ex. C at F56, and apparently suspended, *see* Pl.'s 12(N)(3)(b) ¶ 18.

The parties' factual presentation paints a somewhat cloudy picture of the events occurring between January 10 and Fernbach's formal discharge on January 18. Dominick's

---

the affidavits, parts of the record, and other supporting materials relied upon." Local Rule 12(N)(3)(a). The facts asserted in the movant's 12(M) Statement will be deemed admitted if the non-movant's responses do not contain citations to specific portions of the record supporting the contrary position. *Skagen v. Sears, Roebuck & Co.*, 910 F.2d 1498, 1500 (7th Cir.1990). In addition, under Local Rule 12(N)(3)(b), the non-movant may submit a statement of additional facts that the nonmovant contends require denial of the motion, and Local Rule 12(M) provides

that the movant may likewise respond to the 12(N)(3)(b) Statement.

2. Various, isolated parts of the record state that the events leading to Fernbach's discharge occurred in January 1994, *e.g.*, Pl.'s 12(M) Appdx., Ex. C at F50, F52, and even January 1996, Pl.'s 12(N)(3)(b) ¶ 14, but the parties' submissions and most of the record clearly reveal that the pertinent year is 1995.

3. Deitterle is also referred to as "head clerk." Pl.'s 12(N) Appdx., Ex. C at F55–56.

simply asserts: "Fernbach was terminated on January 18, 1995." Def.'s 12(M) ¶ 68 (citing complaint). Whereas the defendant does not specifically identify the decisionmaker, Fernbach maintains that Dominick's Loss Prevention Investigator David Howell held two "follow-up meetings" with the plaintiff, one each on January 13 and 18. Pl.'s 12(N)(3)(b) ¶ 14. During the meetings, the plaintiff stated that, while aware of Dominick's policy regarding the necessity of having a receipt for store merchandise, he understood that Dominick's policy only applied to "items to be *consumed* or removed from the store." Pl.'s 12(N)(3)(b) ¶ 14 (emphasis in original).

At the second meeting, on January 18, Howell met with Fernbach and Santiago, who had been on vacation since January 10. Fernbach explained to Howell that the plaintiff "understood the receipt policy to mean that he could not take food or drink items into the break area, but that he did not understand that the policy prohibited him from taking other non-consumable items to his locker to be purchased before removing them from the store." *Id.* ¶ 16. Notwithstanding Santiago's protests to Howell against disciplining Fernbach, Pl.'s 12(N)(3)(b) ¶ 19, Howell's case report indicates that Fernbach was terminated, apparently on January 18, Pl.'s 12(N)(3)(b) Appdx., Ex. C at F53. Soon after the discharge, Fernbach's attorney wrote to Dominick's, unsuccessfully requesting reinstatement in light of the plaintiff's disability and other circumstances. Pl.'s 12(N)(3)(b) ¶ 21, Appdx., Ex. C at F19–21.

Fernbach now brings this action pursuant to title I of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12111–12117, alleging that Dominick's discriminated against him based on his mental disability. Dominick's moves for summary judgment on a number of grounds, and we now turn to those arguments.

## II. Standard for Reviewing Motions for Summary Judgment

▮ Under the Federal Rules of Civil Procedure, summary judgment is appropri-ate if "there is no genuine issue as to any material fact, and. . . . the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The movant bears the initial burden to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). Material facts are those determinative of the outcome of an issue as determined by the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Once the movant has done this, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In deciding a motion for summary judgment, the court must read all facts in the light most favorable to the nonmoving party, *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14, and refrain from making credibility determinations, *Jackson v. Duckworth,* 955 F.2d 21, 22 (7th Cir.1992).

## III. Discussion

Generally stated, title I of the ADA prohibits disability discrimination in employment:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

§ 12112(a).[4] According to Dominick's, Fernbach cannot convince a reasonable trier of fact that he suffers from a "disability," nor can he prove that he was discharged "because of" the purported disability. Although we think that a reasonable jury could find that Fernbach suffers from a disability as

---

**4.** The parties do not dispute that Dominick's is a "covered entity" as defined by the ADA. *See* § 12111(2), (5).

defined by the ADA, we agree that there exists no genuine issue over whether Fernbach was discharged "because of" disability.

## A. *Disability*

■ Under the ADA, an individual suffers from a "disability" if he or she has

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) [is] regarded as having such an impairment.

§ 12102(2)(A)–(C). According to Dominick's, Fernbach's mental impairments do not "substantially limit" his "major life activities." Regulations promulgated by the Equal Employment Opportunity Commission (EEOC) to interpret the ADA define "substantially limits" as

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(i), (ii). "Major life activities" are "functions such as caring for oneself, ... speaking, ... learning, and working." § 1630.2((i); *Roth v. Lutheran General Hosp.*, 57 F.3d 1446, 1454 (7th Cir. 1995). Whether a person's impairment meets the definition of "disability" is an individualized determination made case-by-case. *See id.*[5]

■ In light of these principles, Fernbach raises a genuine issue over whether his mental impairments constitute a disability. According to the plaintiff, and uncontested by Dominick's, his "substantial neurological impairments" include a "seizure disorder, cognitive impairment[,] and a speech impediment." Pl.'s 12(N)(3)(b) ¶ 1. While Dominick's

points out the myriad activities that Fernbach is capable of enjoying, *e.g.*, Def.'s 12(M) ¶¶ 4–5, 8, the defendant does not contest that the mental impairments have caused him

great difficulty with many mental tasks, especially those involving complex, complicated or numerous functions, reading comprehension, remembering and following instructions, math functions, and identifying and understanding large words. His concentration is diminished, and his ability to plan, strategize and analyze is minimal. Other problems include forgetfulness and stuttering.

*Id.* ¶ 2 (citations omitted). Indeed, it is undisputed that "[a]s a result of these problems, Fernbach is unable to live independently." *Id.* ¶ 2. Although it would have been helpful for the plaintiff's doctor to explain precisely how Fernbach's "seizure disorder" and "neurologic deficits in cognitive domains" limit his activities, Pl.'s Dep., Ex. 3, the uncontested evidence proffered by the plaintiff sufficiently raises a question as to whether his ability to care for himself and to perform mental functions is substantially limited. Accordingly, a genuine issue exists as to whether the plaintiff suffers from a disability under the ADA.

## B. *Because of Disability*

■ Next, the defendant argues that no genuine issue exists over the reason for Fernbach's discharge: the plaintiff's violation of store policy regarding employee purchases of merchandise. According to Dominick's, the plaintiff's purported violation renders him outside the ADA's definition of a "qualified" individual, § 12111(8), and thus Fernbach cannot prove discrimination via the indirect method of proof, *see DeLuca v. Winer Indus.*, 53 F.3d 793, 797 & n. 3 (7th Cir.1995) (assuming that first element of ADA prima facie case is plaintiff's membership in protected class of qualified individuals with a disability). The plaintiff disputes the meaning of the merchandise policy, maintaining that he did not actually violate the policy. Pl.'s Resp. at 7–9.

---

**5.** The EEOC regulations describe a number of factors pertinent to the inquiry: "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2)(i)–(iii).

■ We need not conclusively decipher the actual meaning of Dominick's policy, however, because the defendant also argues that the plaintiff's violation constitutes a legitimate, nondiscriminatory reason for discharging Fernbach. Once a defendant adequately articulates a legitimate, nondiscriminatory reason for the employer's action, the plaintiff must produce evidence from which a reasonable trier of fact could conclude that the articulated reason is a pretext. *Fuka v. Thomson Consumer Elec.*, 82 F.3d 1397, 1404 (7th Cir.1996). Where the proffered reason represents the same reason for the plaintiff's failure to prove a prima facie case, we may proceed directly to inquire whether the plaintiff has met his burden of production to show pretext. *Id.*

When evaluating the evidentiary sufficiency of the plaintiff's proof of pretext, we must be wary of the " 'fine line between evidence that appropriately challenges the employer's proffered reasons as being unworthy of credence and evidence that merely shows that the employer made a mistake or a bad business judgment.' " *Schultz v. General Elec. Capital Corp.*, 37 F.3d 329, 334 (7th Cir.1994) (quoting *Kralman v. Illinois Dep't of Veterans' Affairs*, 23 F.3d 150, 156 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 359, 130 L.Ed.2d 313 (1994)), *cert. denied*, —— U.S. ——, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995). In other words, while it is generally true that one way to show pretext is to prove that the proffered reason has "no basis in fact," *Fuka*, 82 F.3d at 1404, the plaintiff's evidence must undermine the *"honesty* of the [employer's] belief," *Russell v. Acme–Evans Co.*, 51 F.3d

64, 68–69 (7th Cir.1995) (emphasis added).[6] Thus, whether Dominick's *mistakenly* applied store policy would not be dispositive of the pretext inquiry; rather, we ask whether Dominick's *honestly* believed that Fernbach violated the merchandise policy and on that basis fired him.

In the instant action, Fernbach proffers no evidence from which a trier of fact could reasonably conclude that the discharge was based on any reason other than the perceived violation of the merchandise policy. The evidence proffered by the parties indicates that the Loss Prevention Investigator, David Howell, with whom Fernbach met in January 1995, was the pertinent decisionmaker.[7] In the Dominick's business record entitled "Case Report," Howell reported that "Fernbach stated that he knew he needed a receipt for merchandise prior to consuming or leaving the store with the same, that he's seen signs posted requiring him to have a receipt with his merchandise, and that he hadn't paid for the merchandise prior to bringing it to the breakroom." Pl.'s 12(M) Appdx., Ex. C at F52.

Although the plaintiff disputes the meaning of the policy,[8] the only evidence he offers to show Howell's explanation a pretext is one instance in which Dominick's did reinstate one previously-discharged, nondisabled "John Doe" employee whom Dominick's believed had violated the policy. *See* Pl.'s 12(M) Appdx., Ex. C at F391, 408, 410–11, 417. However, the plaintiff failed to present this evidence pursuant to Local Rule 12(N)(3)(b), but rather argued factual assertions in his brief and inserted supporting documents in

---

6. We take care not to suggest that proving the dishonesty of the employer's belief is in any way an unbearable burden. *See Russell*, 51 F.3d at 68.

7. Curiously, neither party submitted deposition testimony, an affidavit, or interrogatory answers from Howell.

8. From the evidence proffered by the parties, what we refer to as the "merchandise" policy actually is gleaned from two sources. First, Fernbach acknowledged seeing an "Inter Office Memo" dated September 19, 1994, which stated in relevant part:

    1.) All employees … must purchase any product for *consumption* or personal use, prior to the store closing.

    2.) Employees will not be allowed to *consume* any product prior to purchase.

    3.) Employees must possess a receipt for and Dominick's … merchandise to be *consumed*. Pl.'s 12(M) Appdx., Ex. A (emphases added). In addition, the plaintiff acknowledged seeing a sign near the employee breakroom, stating that: "Please make sure a receipt is attached to all packages and items being *consumed*." *Id.* (emphasis added). The plaintiff's dispute over the actual meaning of the merchandise policy stems from the policy's use of "consume" to describe the prohibited act, a term plausibly read to refer only to food and drink items. Pl.'s Resp. at 7–9.

the appendix to his 12(N)(3)(b) Statement. From this inadequate factual presentation, we do not know who was involved in reinstating the employee, and no evidence points to Howell as the person who decided to reinstate the nondisabled employee. Dominick's proffers evidence showing that the reinstatement occurred at a different Dominick's store and that the director of the area's stores—not Howell—was involved in deciding to reinstate the nondisabled employee. Def.'s Supp. 12(M) Statement. In sum, the plaintiff has failed to raise a genuine issue to dispute that Dominick's terminated him for violating the merchandise policy.

However, although not articulated clearly, see Pl.'s Resp. at 13, the plaintiff seems to argue that, even if Dominick's terminated him for violating the merchandise policy, discharging him on that basis *is* discharge "because of" disability: Fernbach purportedly could not understand the merchandise policy because of his mental disability, Dominick's failed to explain the merchandise policy to him and thus failed to reasonably accommodate the disability, and therefore the sole cause for the violation was the disability because he would not have violated the policy had he understood it. This is a plausible theory of discrimination, see *Despears v. Milwaukee County*, 63 F.3d 635, 637 (7th Cir. 1995); see also EEOC Technical Assistance Manual § 7.7 (January 1992),[9] and does not engraft "but for" causation into the ADA or merely represent a request for a second chance, concepts which do not support liability under the ADA, *Siefken v. Village of Arlington Heights*, 65 F.3d 664, 666–67 (7th Cir.1995). Failing to accommodate Fernbach's disability by not explaining the merchandise policy would be akin to failing to reasonably accommodate a blind employee by not "provi[ding] qualified readers" to inform the employee of the policy (if such an accommodation would not impose an "undue hardship"), § 12111(9), (10), or more pertinently, to failing to reasonably accommodate a mentally disabled employee by not providing "individualized instruction" when needed and not undue, see Technical Assistance Manual §§ 3.10(10), 7.6.

In the instant action, however, Fernbach's own version of the facts dictates that the plaintiff cannot rely on this theory of liability. Nowhere in his 12(N)(3)(b) Statement does he attribute his misunderstanding of the merchandise policy to his mental disability, nor does Fernbach's affidavit make this connection. Indeed, the plaintiff argues that it was "not unreasonable" for him to interpret the policy to pertain solely to food and drink items, particularly because the policy employed the terms "consume" and "consumption" to describe the proscribed conduct. Pl.'s Resp. at 7–9; Pl.'s 12(N) Appdx., Ex. A (store sign and interoffice memo); see supra n. 8. This acknowledgment of the policy's ambiguity, and the absence of any evidence showing that the mental disability—rather than the defendant's poor diction—caused the plaintiff's misunderstanding, preclude a reasonable trier of fact from finding that Dominick's discharged the plaintiff "because of" disability.

### III. Conclusion

Although we ultimately conclude that the defendant did not unfairly discharge the plaintiff—unfairly, that is, in the sense of discriminating on the basis of disability—this conclusion does not necessarily mean that the ADA's aspiration to integrate disabled individuals into our society, § 12101(a)(3), (8)–(9), was not impeded by what some would label an unfair termination—unfair in the sense of discharging a long-time employee, who has worked hard at overcoming unfortunate circumstances, for violating a confusingly-worded policy. Aside from the purview of employment laws, our tradition of at-will employment, which itself serves important values, relies on employers such as Dominick's to soundly exercise their unreviewable discretion. For the reasons discussed, we grant

---

9. In relevant part, § 7.7 of the Technical Assistance Manual states:

    An employer may not discipline or terminate an employee with a disability if the employer has refused to provide a requested reasonable accommodation that did not constitute an undue hardship, and the reason for unsatisfactory performance was the lack of accommodation. § 7.7 at 8.

the defendant's motion for summary judgment. It is so ordered.