**Albano COELHO, et al., Plaintiff,**

v.

**PARK RIDGE OLDSMOBILE, INC., et al., Defendants.**

No. 99 C 5583.

United States District Court, N.D. Illinois, Eastern Division.

Feb. 11, 2003.

Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Michelle R. Teggelaar, Edelman, Combs & Latturner, Chicago, IL, for plaintiff.

Claire Perona Murphy, Steven Craig Florsheim, Daniel A. Shmikler, Sperling, Slater & Spitz, P.C., Chicago, IL, Ronald J. Broida, mark Robert Farrow, Jeffrey A. Tullis, Broida & Tullis, Naperville, IL, for defendants.

## ORDER

GOTTSCHALL, District Judge.

Plaintiff Nicole Coelho, on behalf of the estate of Albano Coelho [1] (the "Estate") has filed suit against Park Ridge Oldsmobile, Inc., d/b/a Tom Noe's Park Ridge Mitsubishi ("PRO") alleging a violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.* The Estate now seeks summary judgment on liability, while PRO seeks summary judgment on all issues. As explained below, PRO's motion for summary judgment is granted and the Estate's motion for summary judgment on liability is denied.

## Background

The following facts are undisputed unless otherwise noted. Mitsubishi Motor Sales of America ("Mitsubishi") is the distributor of Mitsubishi vehicles to dealerships in the United States. In June 1999, Mitsubishi was offering a $1,500 rebate to certain purchasers of the 1999 Mitsubishi Montero Sport. Neither all cash purchasers nor all credit purchasers were eligible for the rebate, but where the Mitsubishi rebate did apply, the same rebate was available to cash purchasers and credit purchasers who chose the rebate rather than a promotional, reduced annual percentage rate ("APR") that was being offered through Mitsubishi's financing subsidiary, Mitsubishi Motors Credit of America ("MMCA"). The promotional, reduced APR of 4.52% was directly subsidized by Mitsubishi, thus allowing customers to pay less than MMCA's standard rate of 8.95%. If a credit purchaser of the Montero Sport opted to receive that promotional APR, then under Mitsubishi's "Official Program Rules" the purchaser was not eligible to receive the rebate.[2]

---

1. Albano Coelho initiated the suit. Because he passed away while the suit was pending, his daughter Nicole, as administrator of his estate, is now the named plaintiff.

2. The Estate contested this fact, arguing that Mitsubishi *created* an incentive program under which dealerships like PRO could *offer* special incentives, including the rebate, to their customers. But the Estate admits the

Dealerships do not have authority to modify the terms and conditions under which Mitsubishi purchasers are eligible for rebates from Mitsubishi.

Further, Mitsubishi, not the dealership, pays the rebate. If a customer qualifies for a rebate, Mitsubishi sends the rebate check directly to the customer a few weeks after the sales transaction, unless otherwise directed by the customer (*e.g.*, a customer could assign the rebate to the dealership as part of his downpayment). Thus, while a customer eligible for the Mitsubishi rebate will pay $1,500 less in his net out-of-pocket costs, the negotiated selling price is not effected by the rebate[3] –the dealership receives whatever price it negotiated for the car.

In June 1999, Albano Coelho ("Coelho"), an experienced car buyer, was in the market for a car for his daughter Carla. On June 28, 1999, Coelho and Carla went to PRO to look at the Montero Sport, which had a window price of $27,445. Coelho brought with him a newspaper advertisement from another dealership–Larry Roesch Mitsubishi–that offered the Montero Sport for a price that was evidently acceptable to Coelho. The Roesch advertisement offered customers (1) a three-year lease on the Montero Sport for $229 per month (excluding $3,369 due at lease signing plus tax, title, license and document fees) or (2) a purchase price of $23,999 after a rebate applied in lieu of the promotional financing[4] (not including tax, title, license and document fees). After initially meeting with PRO salesman Phillip Pabelonio, Coelho met with PRO's sales manager David Manseau to complete the negotiation. According to the Estate, Coelho wanted PRO to meet or beat the $23,999 price advertised in the Roesch advertisement *and* offer him a monthly payment equal to or less than the lease price advertised by Roesch. According to PRO, however, Coelho asked PRO to meet or beat the monthly lease price offered in the Roesch advertisement. Regardless, Coelho initially sought a three-year lease for a Montero Sport.[5]

During the negotiation, Manseau informed Coelho that he was qualified to participate in a financing plan called the Mitsubishi Diamond Advantage Program ("Diamond Advantage plan"), a retail installment contract for a balloon payment. That is, the customer purchases (rather than leases) the vehicle, making equal payments for the agreed-upon time period (*e.g.*, 3 years) with one larger payment at the end. Under the Diamond Advantage plan, after the last equal monthly installment payment, the customer has the option to return the vehicle rather than paying the balloon payment. By purchasing under the Diamond Advantage plan rather than leasing, Coelho would not be required to pay the City of Chicago's taxes applicable to leases. In addition to the Diamond Advantage plan, Coelho qualified for the special 4.52% APR.

---

critical points: that the rebate at issue in this case was a Mitsubishi rebate, and that credit purchasers who elected to take the promotional APR were not eligible for the rebate.

**3.** The Estate contested this fact, claiming that if Coelho had not participated in the Diamond Advantage plan with the reduced APR, PRO would have sold him the vehicle for $1,500 less. The Estate's contention is addressed later in the opinion.

**4.** The ad literally reads: "All incentives applied in lieu of special financing." The $1,500 rebate was such an "incentive" and the promotional APR constituted "special financing."

**5.** The Estate objected to this fact on relevance grounds. The Estate did not contest the fact (nor could it, given that the deposition testimony of both Nicole Coelho and Carla Coelho supports this fact). This fact is deemed admitted under Local Rule 56.1(a)(3).

After Coelho and Manseau discussed financing options, Manseau prepared a retail installment contract ("RIC") for Coelho based on the Diamond Advantage plan and special 4.52% interest rate, using standard industry software. As denoted under the "Federal Truth–In–Lending Disclosures," the RIC called for a cash downpayment from Coelho of $301.58 and a trade-in credit to Coelho of $7,135.22, which resulted in 35 monthly payments of $228.95, after which Coelho had the option of returning the car or making the balloon payment of $16,467.00. The RIC further disclosed an APR of 4.52%, a finance charge of $2,603.00, an amount financed of $21,877.05, and a cash price of $29,241.27, which included $1,796.27 for applicable taxes. Additionally, PRO discounted the window price of the Montero Sport by $1,945.00. This discount was documented in the trade-in credit by adding $1,945.00 to the actual appraised value of the car.[6]

Coelho reviewed and signed the RIC. Coelho did not receive a rebate from Mitsubishi nor did the disclosed finance charges include the amount of the Mitsubishi rebate. Coelho (and after his death, Nicole Coelho) proceeded to make regular monthly payments for the 1999 Montero Sport he purchased. Coelho, however, was not happy with the transaction and sought an explanation regarding the terms of the RIC from Manseau through a facsimile sent on or about July 20, 1999. Manseau responded by facsimile with a handwritten breakdown of the charges in an attempt to explain the figures.

On August 26, 1999, Coelho initiated this litigation.

### Standard of Review

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The court must analyze the admissible evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To avoid summary judgment, however, the party bearing the burden of proof on an issue must affirmatively show the existence of a genuine issue of material fact that requires trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. "[U]nless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," there is no issue for trial. *Id.* at 249, 106 S.Ct. 2505. In cases in which the parties file cross-motions for summary judgment and thus presumably agree that the issues can be decided as a matter of law, the court can still deny both motions if neither party establishes its right to judgment as a matter of law. *See ITT Indus. Credit Co. v. D.S. America, Inc.*, 674 F.Supp. 1330, 1331 (N.D.Ill.1987); 10A Charles Alan Wright et al., *Fed. Practice and Procedure* § 2720 (3d ed.1998).

### Analysis

The Estate claims the $1,500 rebate that Coelho did not receive because he financed his purchase constitutes a finance charge, and contends that PRO therefore violated TILA by failing to include that $1,500 in the disclosed finance charges. PRO counters that the rebate was a Mitsubishi re-

---

**6.** It is not clear whether the Estate disputes this fact, but the fact is supported by an unrefuted affidavit and therefore deemed admitted under Local Rule 56.1(a)(3).

bate, not a PRO rebate, and that TILA only requires disclosures of finance charges imposed by the creditor, *i.e.*, PRO. And in any event, PRO asserts, the rebate does not constitute a finance charge under TILA because it was available to both cash and credit purchasers of the Montero Sport. The court finds that the rebate does not constitute a finance charge and therefore grants summary judgment in favor of PRO. As a result, the court need not address PRO's other argument.

■■■■ The purpose of TILA is to stop creditors from "burying" the cost of credit in the purchase price of goods. *Walker v. Wallace Auto Sales, Inc.*, 155 F.3d 927, 930 (7th Cir.1998). Accordingly, "TILA requires creditors to disclose clearly and accurately to consumers any finance charge that the consumer will bear under the credit transaction." *Id.* As defined by TILA, a finance charge includes all charges "imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a). The federal regulations implementing TILA, known collectively as Regulation Z, explain that a finance charge is "the cost of consumer credit as a dollar amount." 12 C.F.R. § 226.4(a). Finance charges include "[d]iscounts for the purpose of inducing payment by a means other than credit."[7] 12 C.F.R. 226.4(b)(9). The Federal Reserve Board's Official Staff Commentary to Regulation Z[8] explicitly states, however, that finance charges do not include "[d]iscounts that are available to cash and credit customers...." 12 C.F.R. Pt. 226, Supp. I at 340.

■■ Based on the record, it is clear that the Mitsubishi rebate was a discount available to both cash and credit customers, including Coelho, and therefore was not a finance charge. Eligibility for the Mitsubishi rebate did not depend on whether the consumer purchased by cash or credit. Rather, eligibility depended on whether the consumer met the criteria delineated by Mitsubishi. Coelho was not "denied" the rebate because he chose to finance his purchase. Coelho was ineligible for the rebate because he took advantage of the promotional 4.52% APR rather than the standard 8.95% APR. Under Mitsubishi's rules governing eligibility for the rebate, customers purchasing the Montero Sport under the Diamond Advantage plan with the special reduced APR were not eligible for the rebate. Coelho could have received financing *and* the rebate had he financed under the standard interest rate, he just could not have both the 4.52% APR and the rebate.

The Estate, however, steadfastly maintains that PRO "would have sold the vehicle to Mr. Coelho for $1,500 less if he paid cash, and in fact added $1,500 back to the sale price he hoped to obtain, simply because he chose the promotional financing." (Pl.'s Resp. to Def.'s Mot. Summ. J. at 7.) In other words, according to the Estate, "Mr. Coelho would have paid $1,500 less to [PRO] if he had paid cash for the vehicle." (Pl.'s Resp. to Def.'s L.R. 56.1 Statement Add'l Facts at ¶ 24.) But the record clearly shows that claim is inaccurate. Mitsubishi determined the rebate eligibility criteria and paid the rebates, not PRO. And

---

**7.** Even this general rule is subject to exceptions. *See* 12 C.F.R. Pt. 226, Supp. I, at 340 (Finance charges do not include discounts available to consumers who meet specified eligibility criteria even if qualified consumer must pay cash to get the discount, as long as "credit customers who are members of the group and do not qualify for the discount pay

no more than the nonmember cash customers.").

**8.** The Federal Reserve Board's official staff opinions regarding TILA and Regulation Z are binding on this court. *Walker,* 155 F.3d at 931 n. 5 (binding unless clearly irrational).

despite Coelho's argument to the contrary, the rebate affects the customer's net out-of-pocket costs, but not the negotiated sale price the customer owed PRO. PRO, as the dealership, receives whatever sale price it negotiated, regardless of whether the customer is eligible for a rebate from Mitsubishi.

The main basis for the Estate's argument stems from its construction of certain testimony from PRO's sales manager, David Manseau. According to the Estate, Manseau admitted "that he would have sold the Montero Sport for $1,500 less if Mr. Coelho paid cash." (Pl.'s Resp. to Def.'s Mot. Summ. J. at 1.) At his deposition, Manseau was asked whether Coelho could have purchased the vehicle for $23,999 if he had paid cash. Manseau answered: "Yes. We would have sold it for that price, matched it." [9] (Manseau Dep. Tr. at 37:10-11, Def.'s App. Opp. Pl.'s Mot. Summ. J., Tab 8.) Although that answer appears to support the Estate's argument, the answer is taken out of context. A review of the actual testimony, in context, clarifies the meaning of that testimony. Manseau was talking about matching the $23,999 price listed in the Roesch ad–an amount that Manseau had already testified was the price *after* applying the $1,500 rebate. (*Id.* at 36:3–7.) As discussed above, the rebate is paid by Mitsubishi rather than the dealership, and thus the rebate affects the customer's net out-of-pocket costs but not the negotiated sale

price. The only reasonable inference from Manseau's testimony about matching Roesch's advertised price is that PRO would have sold the Montero Sport for a negotiated sale price of $25,499, resulting in a net cost of $23,999 to Coelho after the rebate.[10]

Manseau's affidavit dated May 31, 2002 supports the accuracy of this inference. Manseau states in relevant part:

> Had [Coelho] asked us to match the Larry Roesch sales price, we probably would have agreed. Like the Larry Roesch dealership, we would have sold the Montero Sport LS for an invoice price of $25,499. After the impact of the [Mitsubishi] $1500 rebate that was available to him, Mr. Coelho would have paid a net price of $23,999. Had Mr. Coelho selected this option, he would not have been eligible for the [promotional 4.52%] interest rate he actually received.

(Manseau Aff. ¶ 4, Def.'s App. Opp. Pl.'s Mot. Summ. J., Tab 2.) Of course, as the Estate points out, courts should be skeptical if a party attempts "to retract or explain away concessions that he made in his deposition" by subsequent affidavit. *Russell v. Acme–Evans Co.,* 51 F.3d 64, 67 (7th Cir.1995). Here, however, the deposition and the affidavit are not in conflict regarding the meaning of Manseau's testimony that PRO would have matched Roesch's advertised price.[11] Deponents may prop-

9. Manseau submitted an errata sheet to his deposition transcript to amend this answer with further detail. The Estate objected to this substantive correction. Because the court's ruling is based on Manseau's original, unedited answer, however, the court need not address whether Manseau's correction to his testimony was proper under Fed.R.Civ.P. 30(e).

10. Neither the $25,499 nor the $23,999 price includes taxes, licensing fees, trade-in credit, etc.

11. Even if the deposition and affidavit were in conflict, the affidavit need not be discarded if it is "demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Russell,* 51 F.3d at 67–68.

erly submit affidavits that clarify or augment deposition testimony. *See id.* at 368.

When Manseau stated that PRO likely would have matched the Roesch ad, the only point he conceded was that Coelho would have been eligible for the $1,500 rebate had he paid cash–he did not concede that Coelho would have owed *PRO* $1,500 less. In fact, aside from the disclosed financing costs, Coelho owed PRO nearly the identical amount as a credit customer that he would have owed as a cash customer. Consider the following figures.[12] The window price of the Montero Sport was $27,445. PRO discounted that price by $1,945 for Coelho (which was documented by increasing the actual appraised value of Coelho's trade-in vehicle by that amount). Thus, the amount due to PRO was $25,500. As discussed above, had Coelho paid cash and PRO matched the Roesch ad, Coelho would have owed PRO $25,499.[13] After receiving the $1,500 rebate from Mitsubishi, Coelho's out-of-pocket cost would have been $23,999, but the rebate would not have reduced what Coelho owed PRO.

The Estate obviously believes that Coelho was deceived. But the Estate fails to comprehend that Coelho received more value from Mitsubishi by financing under the promotional APR than he would have had he financed under the standard APR and received the rebate. A qualified credit purchaser of the Montero Sport could receive a discount subsidized by Mitsubishi in one of two ways: he could either finance under the standard 8.95% APR and get the $1,500 rebate from Mitsubishi, or he could finance under the promotional 4.52% APR with Mitsubishi paying MMCA the remaining 4.43% on his behalf. Given that Coelho's finance charges calculated at 4.52% interest over 3 years totaled $2,603.20, Mitsubishi's contribution of 4.43% to MMCA on his behalf undoubtedly was greater than the $1,500 he would have received through the rebate. Further, had Coelho received both the promotional APR and the rebate, he would have received more value from Mitsubishi than either a cash purchaser or standard credit purchaser of the Montero Sport.

The $1,500 rebate that Coelho was ineligible for and did not receive was not a cost of consumer credit, and thus was not a finance charge that should have been disclosed under TILA. The court therefore grants PRO's motion for summary judgment.

### Conclusion

For the reasons explained above, PRO's motion for summary judgment is granted and the Estate's motion for summary judgment on liability is denied.

---

12. These figures do not include taxes, licensing, title and document fees, etc. Further, the amount Coelho owed would have been reduced by his deposit and the (actual, not inflated) appraised trade-in value of his car.

13. The court finds the price differential of one dollar to be inconsequential. The parties do not even address it. Further, given that most vehicle purchases are the product of negotiations between the customer and the dealership, it would be unreasonable to consider such a trivial difference as a possible finance charge.