Nancy L. **DOVIN**, Plaintiff,

v.

**BEAVER DAM EMERGENCY MEDICINE, S.C.**, Emergency Resources Group, Inc., Beaver Dam Community Hospitals, Inc., and John Landdeck, Defendants.

No. 98–C–125.

United States District Court,
E.D. Wisconsin.

April 27, 1999.

William P. Croke, Quale, Feldbruegge, Calvelli, Thom and Croke S.C., Milwaukee, WI, for plaintiff.

Christopher J. Johnson, Joshua B. Levy, Beck, Chaet, Molony & Bamberger, S.C., Milwaukee, WI, for the defendants Beaver Dam Emergency Medicine & Emergency Resources Group, Inc.

Kathy Nusslock, Clifford B. Buelow, Davis & Kuelthau, S.C., Milwaukee, WI, for defendants Beaver Dam Community Hospitals, Inc. and John Landdeck.

DECISION and ORDER

MYRON L. GORDON, District Judge.

This is an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e – 2000e–17 ["Title VII"] and under state contract law. The plaintiff alleges that the defendants, Beaver Dam Emergency Medicine ["BDEM"] and Emergency Resources Group, Inc., ["ERG"] discriminated against her based on her sex and violated the parties' employment agreement by failing to provide her with ninety days written notice prior to termination. In addition, the plaintiff claims that defendants, Beaver Dam Community Hospitals, Inc. ["the Hospital"] and John Landdeck, tortiously interfered with her contract with ERG/BDEM.

BDEM is identified in the complaint as "Beaver Dam Emergency Physicians, S.C." At the scheduling conference of June 8, 1998, the parties stipulated that the proper party was BDEM. Thus, the case caption will be amended to reflect that change.

Presently pending before the court are the following motions: (1) motion for summary judgment of BDEM and ERG; and (2) motion for summary judgment of the Hospital and Mr. Landdeck. Both motions will be granted.

## I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment will be granted when there are no genuine issues as to material fact and the movant is entitled to judgment as a matter of law. *See* Rule 56(c), Federal Rules of Civil Procedure. Under Rule 56(c), the movant must show the following: (1) no genuine issue of material fact exists, and (2) its entitlement to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Only "genuine" issues of "material" fact will defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

As defined by the United States Supreme Court, "material" facts are those facts which, under the governing substantive law, "might affect the outcome of the suit." *Id.* at 248, 106 S.Ct. 2505. A dispute over such material facts is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (citing *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). If the evidence presented by the party or parties opposing is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Id.* at 249–250, 106 S.Ct. 2505.

## II. UNDISPUTED FACTS

The defendants included with their respective motions for summary judgment proposed findings of fact which they believed constituted the factual propositions upon which there is no genuine issue of material fact and affidavits and other evidentiary material in support of those factual assertions. The plaintiff has filed a brief which addresses both of the pending motions but has not filed a response to the respective proposed findings nor has she filed her own proposed findings of fact.

Upon deciding a motion for summary judgment, the court will conclude that there is no genuine issue of material fact as to any proposed finding of fact to which no proper response is set out. *Stewart v. McGinnis,* 5 F.3d 1031, 1034 (7th Cir. 1993), *cert. denied,* 510 U.S. 1121, 114 S.Ct. 1075, 127 L.Ed.2d 393 (1994); Local Rules 6.04 and 6.05(d). While the plaintiff's failure to respond to the defendants' factual assertions requires this court to deem those factual assertions admitted, summary judgment in favor of the movant is not automatic. In such situations, a dis-

trict court must make the further finding that, given the undisputed facts, summary judgment is proper as a matter of law. *Wienco, Inc. v. Katahn Associates, Inc.,* 965 F.2d 565, 568 (7th Cir.1992).

In view of the standards set forth above, I deem the following material facts to be undisputed. Nancy Dovin is a physician licensed to practice medicine in Wisconsin. (Proposed Findings of the Hospital and John Landdeck, hereinafter "Hospital's P.F." ¶ 3.) ERG is a Wisconsin corporation engaged in the business of providing medical group management and consulting services with an emphasis in emergency room services. (Proposed Findings of BDEM and ERG, hereinafter "BDEM P.F." ¶ 2; and Hospital's P.F. ¶ 5.)

Dr. David Moss is a licensed medical doctor and the president of ERG. (BDEM P.F. ¶¶ 1 and 2.) ERG agreed to provide medical services, including physician services, in connection with the operation of the emergency department of the Hospital pursuant to an "Agreement for Emergency Services" ["the Service Agreement"] between ERG and the Hospital. (BDEM P.F. ¶ 4; Hospital's P.F. ¶¶ 12 and 13.) ERG established BDEM, a Wisconsin corporation, to administer the Service Agreement between ERG and the Hospital. (BDEM P.F. ¶ 8.) Dr. Moss was one of the shareholders of BDEM and was also responsible for the day-to-day operations of that corporation, including the hiring, supervision and firing of personnel. (BDEM P.F. ¶ 3.)

Under the Service Agreement, emergency services were to be provided in accordance with accepted standards appropriate to the emergency department and the Hospital, as required by the Joint Commission on Accreditation of Hospitals and Wisconsin law. (BDEM P.F. ¶ 5.) The Service Agreement also provides for mutual consultation between ERG and the Hospital regarding the conduct and performance of contracted physicians by providing, in part:

15. REPORTS TO CORPORATION. The Hospital shall also keep the Corporation informed of any conduct or activities of such physicians which impair their ability to perform services at the Hospital or which may adversely reflect upon their professional conduct, competence or ethics.

16. REPORTS TO HOSPITAL. The Corporation shall also keep the Hospital informed of any conduct or activities of such physicians which impair their ability to perform services at the Hospital or which may adversely reflect upon their professional conduct, competence or ethics.

(Hospital's P.F. ¶ 14.) The Service Agreement allowed either party to terminate it with or without cause. (BDEM P.F. ¶ 6) In addition, the Service Agreement provided the Hospital with the right to terminate, without cause, any physician in accordance with Hospital medical staff bylaws. (Id. at ¶ 7.)

On July 15, 1995, Dr. Dovin entered into an Employment Agreement with BDEM pursuant to which Dr. Dovin was to provide emergency physician services in the emergency room of the Hospital. (Hospital's P.F. ¶ 15; BDEM P.F. ¶ 9.) At all times, Dr. Dovin was employed by BDEM, and, at no time was she employed by ERG. (BDEM P.F. ¶ 10.) The Employment Agreement contained various performance standards including the requirement that Dr. Dovin:

(i) use diligent efforts and professional skill and judgment;

(ii) perform professional and supervisory services in accordance with the recognized standards of the medical profession and those established by the company; [and]

(iii) act in a manner consistent with the principles of medical ethics and the American Medical Association. . . .

(BDEM P.F. ¶ 14.) The Employment Agreement also contained a clause regarding termination, which provides, in part:

5. *Termination.* This Agreement may be terminated prior to the end of the Employment Term only upon the occurrence of any of the events described below. . . .

A. *Cause.* Company may, without liability, forthwith immediately terminate Physician's employment hereunder for Cause at any time, and thereafter Company's obligations hereunder shall cease and terminate. For purposes of this Agreement, "Cause" means (i) any act of misconduct by the Physician which is materially injurious to Company or its reputation, monetarily or otherwise; . . . (iii) Physician's failure to meet performance goals or maintain appropriate standard of patient care established in the reasonable discretion by the Board of Directors of Company; [and] (iv) Physician's failure to perform his duties with Company (other than such failure resulting from his incapacity due to physical or mental illness); . . . .

\*      \*      \*      \*      \*      \*

C. *Notice.* Upon ninety (90) days prior written notice, either party may voluntarily terminate this Agreement.

(BDEM P.F. ¶ 15.) Under the Employment Agreement, Dr. Dovin was to provide physician services to BDEM from August 1, 1995, through December 31, 1997, "unless such employment is sooner terminated." (BDEM P.F. ¶ 12.)

Shortly after Dr. Dovin began her employment, the Hospital received unsolicited complaints about her. (Hospital's P.F. ¶ 18.) The Hospital continued to receive such complaints throughout the time Dr. Dovin provided services at the Hospital. (Hospital's P.F. ¶ 19.) During this same period, the Hospital and John Landdeck, the president, chief operating officer and a board member of the Hospital, received unsolicited communications from outside doctors, including the personal physicians of patients seen by Dr. Dovin, expressing concerns about the medical services provided by Dr. Dovin in the Hospital emergency room. (Hospital's P.F. ¶ 20.)

Similar complaints about Dr. Dovin's performance were also received by Dr. Ken Solis, who was the medical director of BDEM from July 1995 through January 1, 1997. (BDEM P.F. ¶¶ 30–32.) In his role as medical director, Dr. Solis was responsible for quality assurance as it related to BDEM's obligation to provide medical services to the emergency room of the Hospital. (Id. at ¶ 31.) Dr. Solis was responsible for monitoring the services rendered by all emergency room staff of the Hospital, including Dr. Dovin. (Id. at ¶ 31.) Based on his personal observation of Dr. Dovin and the reports received by him in his capacity as medical director, Dr. Solis concluded over the period of Dr. Dovin's employment that she was failing to perform her duties consistent with appropriate standards of patient care which should be expected by a physician working in the emergency room. (BDEM P.F. ¶ 33.)

Furthermore, in his affidavit Dr. Moss has averred that, based on the reports he received from Hospital staff and patients in his capacity as manager of ERG and shareholder of BDEM, Dr. Dovin failed to maintain appropriate standards of patient care and had engaged in misconduct that was materially injurious to BDEM or its reputation. (BDEM ¶ 21.)

Among the instances of inappropriate or unprofessional conduct which were either observed by Dr. Solis or Dr. Moss or reported to them or to other personnel of the Hospital were the following:

1. *August 4, 1995* —Child was diagnosed with an ear infection by Dr. Dovin and given a two-day supply of an antibiotic but no prescription. According to the child's mother, the family doctor checked the girl the following day and found she had a sore throat ("pharyngitis"), but no ear infection. The mother also claimed that Dr. Dovin did not check the girl's throat. In its findings of fact the defendant's acknowledge that Dr. Dovin disputes that fact. After the mother stated that she would never come to the Hospital's emergency room again because of this experience, Dr. Landdeck wrote the par-ents a letter of apology and dropped the related medical charges. (BDEM P.F. ¶ 35a; Hospital's P.F. ¶¶ 21–23.)

2. *October 9, 1995* —The intensive care unit ["ICU"] chairperson expressed concerns in a letter to Dr. Dovin regarding her treatment of a patient for a cardiac problem. The letter advised Dr. Dovin that "most of the ICU committee members (internists) feel that the patient [seen by Dr. Dovin] was a candidate for thrombolytic therapy," which had not been provided or recommended by Dr. Dovin. The letter went on to state that "it is not clear from the notes that you realized that the patient was having acute coronary insufficiency" [a heart attack]. (BDEM P.F. ¶ 35b; Hospital's P.F. ¶ 24.)

3. *October 12, 1995* —The Hospital received a call from a disgruntled patient complaining about services the patient had received in the Hospital emergency room, including services rendered by Dr. Dovin. By letter of October 13, 1995, Mr. Landdeck promised to look into the patient's concerns.

4. *November 1995* —Dr. Dovin missed "free air" on abdominal film—an important sign that a hole has developed in the stomach or intestines. She was informed of the misread and the x-rays were reviewed with her. (BDEM P.F. ¶ 35c.)

5. *December 13, 1995* —Laura E. Fisk, the human resources coordinator of a company, wrote a letter to the Hospital complaining about the treatment provided to an employee by the Hospital emergency room. The Hospital was informed that the employee told Ms. Fisk that Dr. Dovin was rude and dismissive and not at all helpful to him. According to the employee, Dr. Dovin gave him "very little direction or guidance for the care of his [injury]." Ms. Fisk's letter further stated that "[i]t is extremely important that [the company] feel comfortable referring our Associates to [the Hospital] for service," and requested "follow-up to this complaint." (Hospital's P.F. ¶ 28; BDEM ¶ 35e.) In response, Dr. Landdeck informed Ms. Fisk,

by letter, that he would ask the medical director of the department to review the matter and speak with Dr. Dovin. (Hospital's P.F. ¶ 29.)

6. *December 1995/January 1996* —ICU committee chairperson sent a letter to Dr. Dovin regarding the insufficient care and work-up she gave a patient with acute hyperkalemia (high potassium), a serious condition from which the patient ultimately died. Dr. Dovin was asked to respond to the ICU committee. (Hospital's P.F. ¶ 31; BDEM P.F. ¶ 35f.)

7. *December 1995* —Dr. Solis received complaints from nurses regarding Dr. Dovin's delay in the diagnosis of a sudden bleed around the brain of a patient. Despite the requests by the nurses, Dr. Dovin refused to get a head CT scan until the work-up for a serious infection (which the patient did not have) was complete. Dr. Dovin prescribed Imitrex, a medicine for migraines, even though the patient did not have a prior history of migraines. (BDEM P.F. ¶ 35g.)

8. *December 30, 1995* —Another patient complained to the Hospital about Dr. Dovin missing a vertebral (spine bone) compression fracture. Mr. Landdeck responded to the patient's complaint by letter of January 15, 1996, in which he promised to "visit with the radiologist about whether Dr. Dovin should have been able to correctly interpret the x-ray." This matter was also reviewed by Dr. Solis who wrote a memo to Mr. Landdeck in which he expressed "concern that the compression fracture was not seen on the first visit." He further explained that while "this kind of fracture could be missed by an ED [emergency department] physician" . . . . "it is rare for us to miss major fractures or ones that can cause consequences if missed." (Hospital's P.F. ¶¶ 34 and 35; BDEM P.F. ¶ 35h.)

9. *February 8, 1996* —The Hospital received another complaint from a patient about Dr. Dovin's care. This patient was dissatisfied with the fact that, after a long wait in the emergency room, Dr. Dovin spent little time with her, scratched the patient's throat when performing a step test and was "very rude and uncaring." Again, Mr. Landdeck responded in writing to the patient apologizing for the treatment she had received in the emergency room.

10. *February 14, 1996* —Complaint received from staff physician regarding Dr. Dovin's misinterpretation of an EKG as reading atrial fibrillation rather than a normal rhythm.

11. *February 22, 1996* —A physician from a neighboring community expressed concern that Dr. Dovin prescribed Tylenol for one of his patients at ⅛ the dose required for the patient. More significantly, after diagnosing the patient as having an allergic reaction to erythromycin, an antibiotic, Dr. Dovin prescribed another antibiotic which "is only synthetic erythromycin, and will have the same allergic reaction." (BDEM P.F. ¶ 35k; Hospital's P.F. ¶ 40.)

12. *February 22, 1996* —A mother complained to Mr. Landdeck about being charged for a sling and a splint after Dr. Dovin erroneously diagnosed a bone fracture. As a result, the Hospital removed the charges from the patient's bill. However, Dr. ·Dovin's provision of services in this case was deemed defensible. (BDEM P.F. ¶ 35l; Hospital's P.F. ¶ 40.)

13. *March 7, 1996* —ICU chairperson, Dr. Miller, complains by letter to Dr. Solis that Dr. Dovin had not responded to the committee's requests concerning what appear to be inappropriate care in at least two situations. Dr. Miller asked Dr. Solis to ask Dr. Dovin personally for a response. Dr. Solis complied. By letter of March 12, 1996, Dr. Solis informed Dr. Miller that he has discussed one of the cases at issue with Dr. Dovin and apologized "for the lack of communication on [Dovin's] part." In addition, he noted that "Dr. Dovin will no longer be working in the Beaver Dam Emergency Department as of today due [to] various problems in her delivery of emergency care." (Hospital's P.F. ¶¶ 41 and 42; BDEM P.F. ¶ 35n.)

On or about March 12, 1996, BDEM received correspondence from the president of the Hospital, Mr. Landdeck, which stated as follows:

Reports reaching me from the community indicate that Dr. Dovin is single-handedly demolishing our image in the emergency service. People comment on her rude behavior and question her medical judgment. She is abrasive, short tempered, does not show any compassion to patients and families, and generally demonstrates a lack of caring for the outcome of the case.

It is extremely important that she be replaced in the schedule as quickly as possible. Our continued relationship is dependent on a highly qualified and compassionate physician staff in the department.

(BDEM P.F. ¶ 22.) On March 15, 1996, a decision was reached by BDEM to discharge Dr. Dovin. (BDEM P.F. ¶ 23.) BDEM's decision was based on Dr. Dovin's failure to perform or maintain an appropriate standard of patient care and other acts which were injurious to BDEM and its reputation. (Id.) Dr. Dovin was sent correspondence on April 5, 1996, terminating her employment with BDEM effective April 8, 1996, which stated, in part:

As per our discussion, you have had acts of misconduct which are materially injurious to the company or its reputation, monetarily or otherwise, and have failed to meet the performance goals or maintain an appropriate standard of patient care established by the Board of Directors of the company. You have violated these provisions item # 5–C i and iii of the employment contract for cause termination.... You are hereby terminated from employment with [BDEM] effective April 8, 1996.

(BDEM P.F. ¶ 24.)

Throughout Dr. Dovin's employment, BDEM spent considerable time and effort in an attempt to assist her in improving her quality of patient care, such as offering her course work and counseling and arranging for her to attend seminars on emergency medicine. (BDEM P.F. ¶¶ 25 and 26.) Despite these efforts, Dr. Dovin failed to meet the minimal standards of professionalism required for her position. (Id at ¶ 27.)

From the inception of staffing of BDEM in July 1995 through the date of Dr. Dovin's discharge, BDEM hired every woman who ever applied to work at BDEM as a physician. (Id. at ¶ 28.)

As part of its normal business operations, the Hospital maintains an Emergency Services Committee ["ES committee"], which normally meets monthly to discuss issues relating to the operation of the Hospital's emergency room. (Hospital's P.F. ¶ 55.) Minutes of the monthly meetings are kept by the committee. (Id. at ¶ 56.) Among the regular members of the ES committee are Mr. Landdeck, in his capacity as president of the Hospital, Dr. Solis, in his capacity as acting medical director of the emergency room at the Hospital and Dr. David Madenberg—a physician contracted to the Hospital through BDEM and an officer or official of BDEM. (Id. at ¶ 57.)

On at least two occasions, the ES committee specifically addressed concerns and complaints regarding Dr. Dovin's competence, performance and attitude in providing medical services to patients of the Hospital pursuant to her contract with BDEM. (Id. at ¶ 58.) According to the minutes of the December 12, 1996, committee meeting, the ES committee discussed Dr. Dovin as follows:

ERG actively seeking full time/permanent ER physicians to replace Dr. Dovin. Committee discussed concerns regarding Dr. Dovin's practice, including (1) Technical competence—specific concerns in six charts reviewed by Dr. Madenberg; (2) Ability to make patients and families feel confident and comfortable; (3) Ability to make physicians and nursing supervisors feel confident in her abilities.

(Id. at ¶ 59.)

On occasion, upon receiving a patient complaint or doctor report about Dr. Do-

vin, Mr. Landdeck discussed his concerns regarding Dr. Dovin with Dr. Solis and Dr. Madenberg. (Id. at ¶ 52.) In his communications with Dr. Solis, Dr. Madenberg and other members of the ES committee concerning Dr. Dovin, Mr. Landdeck believed he was participating in good faith in a review or evaluation of Dr. Dovin's services as a health care provider. (Id. at ¶ 60.) Sometime before March 12, 1996, Mr. Landdeck spoke with Dr. Madenberg to express his concerns regarding the quality of care and medical services provided in the Hospital emergency room by Dr. Dovin and his good faith belief that her continued service was not in the best interests of the Hospital or its patients. (Id. at ¶ 62.) In response, Dr. Madenberg requested that Mr. Landdeck express his view regarding Dr. Dovin in writing. (Id. at ¶ 63.) As a result, Mr. Landdeck wrote the March 12, 1996, letter discussed above. (Id. at ¶ 64.)

At no time did Mr. Landdeck request that ERG or BDEM terminate Dr. Dovin's employment but only that she not be assigned to perform any further medical duties in the Hospital emergency room. (Id. at ¶ 66.) March 12, 1996, was Dr. Dovin's final day providing medical services at the Hospital emergency room.

### III. MOTION FOR SUMMARY JUDG-MENT OF THE HOSPITAL AND MR. LANDDECK

Dr. Dovin alleges that the Hospital and Mr. Landdeck are liable for tortiously interfering with the contractual relationship she had with BDEM. Under Wisconsin law, the elements of the tort of interference with contract are those set for in the Restatement (Second) Torts, § 766 *f* (1979), which provide, in relevant part:

*Intentional Interference With Performance of Contract By Third Person*

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the

pecuniary loss resulting to the other from the failure of the third person to perform the contract.

The Hospital and Mr. Landdeck argue that they are entitled to summary judgment on the plaintiff's tortious interference claim on five grounds:

1. Landdeck's actions were protected by § 146.37 Stats., which provides civil immunity for the acts or omissions of any person who, in good faith, participates in the review or evaluation of the services of health care providers.

2. All communications attributed to Hospital and Landdeck were fully privileged and justified, notwithstanding their alleged interference with Dovin's contract with [BDEM].

3. Hospital's duty to its patients superceded any alleged duty not to interfere with Dovin's contractual relations with [BDEM].

4. All statements attributed to Hospital and Landdeck were truthful expressions of good faith belief or opinion.

5. All communications and actions between Hospital or Landdeck with [BDEM], as described in the complaint, were subject to a conditional privilege for communications between members of a common enterprise.

6. Public policy requires free, open and candid communication between and among a hospital and its administrators, including communication with corporations providing contracted medical services, with regard to the performance of doctors providing such medical services.

7. Hospital and Landdeck had a privilege to communicate their good faith advice and other information to ERG/[BDEM] at the request of ERG/[BDEM].

(Memorandum of Hospital and Landdeck in Support of Motion for Summary Judgment, pp. 13–14.)

In her short response, Dr. Dovin acknowledges that the Hospital and Mr. Landdeck had a right to communicate with

BDEM concerning her performance. Thus, Dr. Dovin is not complaining that, in general, the communication between the Hospital/Mr. Landdeck and BDEM regarding her performance improperly interfered in her employment contract with BDEM. Rather, Dr. Dovin points to one communication in particular which she argues amounted to tortious interference. Specifically, she contends that the March 12, 1996, letter Mr. Landdeck sent to BDEM amounted to tortious interference insofar as it "effectively issued an order to [BDEM] that she be terminated immediately." (Dovin Memorandum in Opposition to Motion for Summary Judgment, p. 10.) Dr. Dovin argues that summary judgment should be denied because a genuine issue of material fact exists as to whether Mr. Landdeck's letter of March 12, 1996, amounted to a directive to BDEM to terminate Dr. Dovin.

■ The problem with Dr. Dovin's argument is that she fails to point to any evidence in the record which supports her contention that the March 12, 1996, letter constituted a directive to BDEM to terminate her. The letter itself asks only that BDEM "replace her in the schedule as quickly as possible." (BDEM P.F. ¶ 22.) In addition, Mr. Landdeck has testified by affidavit that at no time did he request, demand or imply that Dovin's contract with ERG/[BDEM] be terminated, but only that Dovin provide no further services in the [Hospital] emergency room. (Landdeck Aff. ¶ 2; Hospital P.F. ¶ 66.) This testimony has gone unchallenged by the plaintiff.

The plaintiff has failed to present any evidence upon which a reasonable jury could find that the conduct of the Hospital or Mr. Landdeck *improperly* interfered with her contract with BDEM. Moreover, Dr. Dovin has not provided any argument or evidentiary support to challenge any of the six exceptions or privileges to the rule against tortious interference which the Hospital and Mr. Landdeck argue are applicable in this case. For instance, Dr. Dovin does not rebut or contradict the assertion by the Hospital and Mr. Landdeck that they acted in good faith to protect the interests of the Hospital's patients thereby entitling them to civil immunity for their acts under Wis.Stats. § 146.37.

Accordingly, the tortious interference claim against the Hospital and Mr. Landdeck will be dismissed, with prejudice.

### IV. MOTION FOR SUMMARY JUDGMENT OF ERG AND BDEM

The plaintiff has launched the following two claims against defendants BDEM and ERG: (1) they terminated her employment because of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; and (2) they violated the employment agreement by failing to provide her with ninety days written notice prior to termination. The defendants seek summary judgment with respect to both of these claims. In the alternative, with respect to defendant ERG, the defendants seek dismissal of both claims on the ground that ERG is not a proper party in this action.

### A. Sex Discrimination Claim

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). There are two ways that a plaintiff like Dr. Dovin claiming sex discrimination in employment can overcome an employer's motion for summary judgment. The first is by offering direct proof of sex-based discrimination, and the second is by using the so-called *McDonnell Douglas* method—the frequently used burden-shifting framework first set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Troupe v. May Dept. Stores, Co.*, 20 F.3d 734, 736 (7th Cir.1994). According to the court of appeals for the seventh circuit, "direct evidence" is defined as evidence which "if

believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *See Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir.1997) (citing *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 569 (7th Cir.1989)).

Dr. Dovin does not argue in her brief in opposition to the defendants' motion for summary judgment that there is any direct evidence of sex discrimination. Thus, it appears that she relies primarily on the burden-shifting method to prove her claim for sex discrimination. Under this standard, Dr. Dovin first has the burden of establishing a prima facie case of sex discrimination by showing all of the following: (1) she is in a member of a protected class; (2) she met her employer's legitimate expectations; (3) she was discharged or suffered some other adverse employment decision; and (4) similarly situated employees were treated more favorably. *Id.; Ulreich v. Ameritech Cellular Communications, Inc.*, 1999 WL 160838 (N.D.Ill. March 16, 1999). If the plaintiff establishes a prima facie case, there is a rebuttable presumption of sex discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

■ After a prima facie case has been established, the burden of production then shifts to the employer to articulate a legitimate non-discriminatory reason for discharging the plaintiff; if the employer meets its burden of production, the burden shifts back to the plaintiff to show that the employer's proffered explanation is merely a pretext for age discrimination. *Taylor v. Canteen Corp.*, 69 F.3d 773, 780 (7th Cir. 1995). However, at all times, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against her because of her sex remains with the plaintiff. *Id.* (citing *St. Mary's Honor Ctr.*, 509 U.S. at 507, 113 S.Ct. 2742.).

ERG and BDEM argue that Dr. Dovin cannot satisfy the second and fourth elements of a prima facie case. The defendants contend that Dr. Dovin's unprofessional demeanor and inadequate provision of medical care demonstrate that she was not performing the legitimate expectations of her job. Moreover, ERG and BDEM assert that Dr. Dovin has presented no evidence of other similarly situated employees who were treated more favorably. In addition, ERG and BDEM maintain that even if Dr. Dovin could make out a prima facie case, she is unable to show that their reason for terminating her—that Dr. Dovin's skill and performance in the emergency room did not satisfy appropriate medical standards—was pretextual.

■ Dr. Dovin argues that summary judgment should not be granted on her discrimination claim because "there is evidence demonstrating unequal treatment, thus presenting this court with the existence of a genuine issue of material fact, . . . ." However, Dr. Dovin has not pointed to one shred of evidence to suggest that any other employees were treated more favorably, much less any similarly situated employees. Her sole contention is that Dr. Solis, the medical director of the emergency room (a male), was given priority in scheduling; this factor is not probative because it has not been shown that Dr. Solis, Dr. Dovin's superior, was "similarly situated" to Dr. Dovin. Moreover, she offers no other type of evidence to support her bald assertion that there is evidence of "unequal treatment." Because the plaintiff has totally failed to satisfy the fourth element of a prima facie case, the defendants are entitled to summary judgment on the plaintiff's discrimination claim.

■ Even if the plaintiff had established a prima facie case, I would be obliged to grant summary judgment in favor of the defendants. This is so because the plaintiff does not even argue, much less refer to evidence, which tends to demonstrate that the reasons offered by the defendants for her discharge were pretextual. "Pretext

... means a lie, specifically a phony reason for some action." *Plair*, 105 F.3d at 348 (citing *Russell v. Acme–Evans Co.*, 51 F.3d 64, 68 (7th Cir.1995)). Dr. Moss, who managed the day-to-day operations of BDEM has testified that BDEM's decision to terminate Dr. Dovin was based on her failure to perform or maintain an appropriate standard of patient care and other acts which were injurious to BDEM and its reputation. (BDEM P.F. ¶ 23.) Dr. Dovin has presented no cogent evidence to contest this assertion. Dr. Dovin's own conclusory statement that the complaints launched against her were illegitimate is not probative. Dr. Dovin has not deposed Dr. Moss or any of the other persons involved in the decision to terminate her and the conclusory statements in her affidavit evaluating her own performance do not create an issue of fact. *See Sample v. Aldi Inc.*, 61 F.3d 544, 549 (7th Cir.1995) (citing *Russell*, 51 F.3d at 69.)

### B. Violation of Employment Agreement

The plaintiff complains that the defendants violated their Employment Agreement when it terminated her without giving her ninety days written notice. The defendants contend that the Employment Agreement allowed them to terminate Dr. Dovin for "cause" immediately and "without liability" such that they were not required to provide her with ninety days written notice.

The Employment Agreement provides, in part, that "cause" for terminating the agreement immediately exists where there is "any act of misconduct by the Physician which is materially injurious to Company or its reputation, monetarily or otherwise" or "due to Physician's failure to meet performance goals or maintain appropriate standard of patient care established in the reasonable discretion by the Board of Directors of the Company." The Employment Agreement permits the Company to terminate an employee immediately for cause.

The parties agree that the term "misconduct" is unambiguous. However, they disagree on the definition of the term.

The plaintiff, who relies on the definition found in Webster's New Collegiate Dictionary (1981 ed.), states that "misconduct" is an intentional wrongdoing and deliberate violation of law or standard. According to the plaintiff, none of the patient complaints or doctor reports which the defendants received about her performance demonstrates that she engaged in deliberate or intentional wrongdoing. Furthermore, the plaintiff asserts that the defendants have not identified the specific "performance goals" that she did not live up to nor have they specified which standards of patient care established by the Board of Directors were violated.

In my opinion, the definition of misconduct advanced by the plaintiff is unjustifiably narrow. Indeed, as the following quotation shows, the plaintiff's own source, Webster's Dictionary, actually defines misconduct more broadly:

> 1. mismanagement especially of governmental or military responsibilities; 2. intentional wrongdoing: deliberate violation of a law or standard of behavior esp. by a government official: MALFEASANCE; 3.a. bad conduct: improper behavior, b. sexual immorality; *esp:* ADULTERY.

Webster's Third New International Dictionary 1443 (3rd ed.1986). Thus, the question on summary judgment becomes whether the undisputed facts show that the plaintiff's conduct fell within this broad definition of misconduct.

In determining whether the plaintiff committed misconduct that was materially injurious to BDEM, or its reputation, monetarily or otherwise, the plaintiff states that it is improper to consider the individual complaints the Hospital received from disgruntled patients or the personal physicians of disgruntled patients because such correspondence is hearsay. In response, the defendants, without further explanation or citation to any controlling authority, argue that such correspondence fall within the exception to the hearsay rule under Rule 803(6), Federal Rules of Evi-

dence. Rule 803(6) provides that certain records of regularly conducted business activity are not excluded by the hearsay rule.

The court is unable to resolve this controversy at this stage of the proceedings. The parties have not provided the court with sufficient evidence concerning the manner in which the documents concerning the complaints about Dr. Dovin were received and kept nor have they adequately specified which documents were letters as opposed to reports from Hospital personnel. Such information is vital to determining whether the materials, in whole or in part, fall within the exception to the hearsay rule under Rule 803(6).

Notwithstanding this apparent factual dispute, I do not believe that the plaintiff has successfully shown that a genuine issue of material fact exists as to whether she committed misconduct under the terms of the Employment Agreement. This is so because Dr. Dovin has not refuted the evaluations given by Dr. Moss, Dr. Solis and Mr. Landdeck concerning her provision of services in the emergency department. Both Dr. Moss and Dr. Solis concluded, based on information they received from patients and emergency room personnel as well as their own personal observations of Dr. Dovin, that Dr. Dovin had failed to maintain an appropriate standard of patient care and had also engaged in acts of misconduct which were materially injurious to BDEM and its reputation. (BDEM P.F. ¶¶ 21 and 33.) Specifically, Dr. Solis has testified that the plaintiff's continued employment as an emergency room physician placed at risk the lives of those individuals for whom BDEM was required to care and threatened BDEM's responsibility to the Hospital's emergency department. (BDEM P.F. ¶ 34.) Further, Dr. Dovin has offered no evidence to dispute Mr. Landdeck's statement that she has exercised questionable medical judgment or his characterization of her professional performance as rude, abrasive, short tempered and lacking in compassion. (BDEM ¶ 22.)

■ Clearly, failure to maintain an appropriate standard of patient care and placing at risk patient lives is "bad conduct" and "improper behavior" for an emergency room doctor. Similarly, exercising questionable medical judgment and unprofessional demeanor toward patients also meets this test. The fact that BDEM's contention that its community reputation and contract with the Hospital were threatened by Dr. Dovin's improper behavior has gone unchallenged establishes that Dr. Dovin's misconduct was materially injurious to BDEM's reputation, monetarily or otherwise.

In view of the undisputed testimony of Dr. Moss, Dr. Solis and Mr. Landdeck, the court has little choice but to conclude that the undisputed evidence shows that the plaintiff committed "misconduct ... which [was] materially injurious to [BDEM] or its reputation, monetarily or otherwise; ...". Hence, the defendants properly terminated Dr. Dovin, without notice, under the Employment Agreement. The plaintiff has failed to present any evidence in support for her claim that the defendants violated their Employment Agreement, and, therefore, has fallen woefully short of meeting her burden of proof on such claim. Accordingly, the defendants are entitled to summary judgment on the plaintiff's claim that they violated the Employment Agreement.

As an additional matter, because I have concluded that all of the plaintiff's claims against BDEM and ERG shall be dismissed on their merits, I need not address the defendants' alternative argument that the plaintiff's claims against ERG should be dismissed because ERG is not a proper party to this action.

### C. BDEM's Entitlement to Attorney's Fees

■ BDEM also seeks attorney's fees under the Employment Agreement which provides, in part (emphasis added):

If any legal proceeding is necessary to enforce Physician's obligations or *inter-*

*pret the terms of this Agreement,* or to recover damages for Company for breach of Physician's duty hereof, Company shall be entitled to recover from Physician reasonable attorney's fees and necessary costs and disbursements *incurred in such litigation,* in addition to any other relief to which Company may be entitled.

The plaintiff does not contest this provision of the Employment Agreement nor does she dispute BDEM's entitlement to attorney's fee thereunder. I find that BDEM is entitled to its reasonable attorney's fees as provided under the Employment Agreement. However, because those attorney fees are limited to the fees incurred in connection with litigation necessary "to ... interpret the terms" of the Agreement, BDEM is only entitled to the fees incurred in defending the plaintiff's breach of contract claim. In other words, the Employment Agreement does not permit BDEM to recover attorney's fees incurred with respect to the plaintiff's Title VII claim.

BDEM will be directed to serve and file a statement of the reasonable attorney fees it incurred with respect to the plaintiff's contract claim no later than Wednesday, May 26, 1999. The plaintiff will be directed to serve and file a response to that statement no later than Wednesday, June 9, 1999. The plaintiff's reply, if any, should be served and filed by Wednesday, June 16, 1999.

### ORDER

Therefore, IT IS ORDERED that the case caption be and hereby is amended to name "Beaver Dam Emergency Medicine" as a defendant in place of "Beaver Dam Emergency Physicians, S.C."

IT IS ALSO ORDERED that the motion for summary judgment of the Hospital and Mr. Landdeck be and hereby is granted.

IT IS FURTHER ORDERED that the plaintiff's claim against the Hospital and Mr. Landdeck be and hereby is dismissed, with prejudice and with costs.

IT IS FURTHER ORDERED that the motion of BDEM and ERG for summary judgment be and hereby is granted.

IT IS FURTHER ORDERED that the plaintiffs' claims against BDEM and ERG be and hereby are dismissed, with prejudice and with costs.

IT IS FURTHER ORDERED that BDEM be and hereby is entitled to its reasonable attorney's fees limited to fees incurred in connection with the plaintiff's claim that it violated the Employment Agreement.

IT IS FURTHER ORDERED that the following schedule be and hereby is set with respect to BDEM's statement of reasonable attorney's fees: BDEM is directed to serve and file its statement of the reasonable attorney fees it incurred with respect to the plaintiff's contract claim no later than Wednesday, May 26, 1999; the plaintiff is directed to serve and file a response to the statement no later than Wednesday, June 9, 1999; and the plaintiff's reply, if any should be served and filed by Wednesday, June 16, 1999.

IT IS FURTHER ORDERED that this action be and hereby is dismissed.